## KASTIGAR ET AL. *v.* UNITED STATES

No. 70–117.   Argued January 11, 1972—Decided May 22, 1972

POWELL, J., delivered the opinion of the Court, in which BURGER, C. J., and STEWART, WHITE, and BLACKMUN, JJ., joined. DOUGLAS, J., *post,* p. 462, and MARSHALL, J., *post,* p. 467, filed dissenting opinions. BRENNAN and REHNQUIST, JJ., took no part in the consideration or decision of the case.

*Hugh R. Manes* argued the cause and filed briefs for petitioners.

*Solicitor General Griswold* argued the cause for the United States.  With him on the brief were *Assistant Attorney General Wilson, Assistant Attorney General Rehnquist, Jerome M. Feit,* and *Sidney M. Glazer.*

Briefs of *amici curiae* urging reversal were filed by *Melvin L. Wulf, Fred Okrand, A. L. Wirin,* and *Laurence R. Sperber* for the American Civil Liberties Union et al.; by *Benjamin Dreyfus* for the National Lawyers Guild; and by *Morton Stavis* and *Arthur Kinoy* for the Center for Constitutional Rights.

Mr. Justice Powell delivered the opinion of the Court.

This case presents the question whether the United States Government may compel testimony from an unwilling witness, who invokes the Fifth Amendment privilege against compulsory self-incrimination, by conferring on the witness immunity from use of the compelled testimony in subsequent criminal proceedings, as well as immunity from use of evidence derived from the testimony.

Petitioners were subpoenaed to appear before a United States grand jury in the Central District of California on February 4, 1971. The Government believed that petitioners were likely to assert their Fifth Amendment privilege. Prior to the scheduled appearances, the Government applied to the District Court for an order directing petitioners to answer questions and produce evidence before the grand jury under a grant of immunity conferred pursuant to 18 U. S. C. §§ 6002–6003. Petitioners opposed issuance of the order, contending primarily that the scope of the immunity provided by the statute was not coextensive with the scope of the privilege against self-incrimination, and therefore was not sufficient to supplant the privilege and compel their testimony. The District Court rejected this contention, and ordered petitioners to appear before the grand jury and answer its questions under the grant of immunity.

Petitioners appeared but refused to answer questions, asserting their privilege against compulsory self-incrimination. They were brought before the District Court, and each persisted in his refusal to answer the grand jury's questions, notwithstanding the grant of immunity. The court found both in contempt, and committed them to the custody of the Attorney General until either they answered the grand jury's questions or the term of the grand jury expired.[1] The Court of

---

[1] The contempt order was issued pursuant to 28 U. S. C. § 1826.

Appeals for the Ninth Circuit affirmed. *Stewart* v. *United States*, 440 F. 2d 954 (CA9 1971). This Court granted certiorari to resolve the important question whether testimony may be compelled by granting immunity from the use of compelled testimony and evidence derived therefrom ("use and derivative use" immunity), or whether it is necessary to grant immunity from prosecution for offenses to which compelled testimony relates ("transactional" immunity). 402 U. S. 971 (1971).

## I

The power of government to compel persons to testify in court or before grand juries and other governmental agencies is firmly established in Anglo-American jurisprudence.[2] The power with respect to courts was established by statute in England as early as 1562,[3] and Lord Bacon observed in 1612 that all subjects owed the King their "knowledge and discovery."[4] While it is not clear when grand juries first resorted to compulsory process to secure the attendance and testimony of witnesses, the general common-law principle that "the public has a right to every man's evidence" was considered an "indubitable certainty" that "cannot be denied" by 1742.[5] The power to compel testimony, and the corresponding duty to testify, are recognized in the Sixth Amend-

---

[2] For a concise history of testimonial compulsion prior to the adoption of our Constitution, see 8 J. Wigmore, Evidence § 2190 (J. McNaughton rev. 1961). See *Ullmann* v. *United States*, 350 U. S. 422, 439 n. 15 (1956); *Blair* v. *United States*, 250 U. S. 273 (1919).

[3] Statute of Elizabeth, 5 Eliz. 1, c. 9, § 12 (1562).

[4] *Countess of Shrewsbury's Case*, 2 How. St. Tr. 769, 778 (1612).

[5] See the parliamentary debate on the Bill to Indemnify Evidence, particularly the remarks of the Duke of Argyle and Lord Chancellor Hardwicke, reported in 12 T. Hansard, Parliamentary History of England 675, 693 (1812). See also *Piemonte* v. *United States*, 367 U. S. 556, 559 n. 2 (1961); *Ullmann* v. *United States*, *supra*, at 439 n. 15; *Brown* v. *Walker*, 161 U. S. 591, 600 (1896).

ment requirements that an accused be confronted with the witnesses against him, and have compulsory process for obtaining witnesses in his favor. The first Congress recognized the testimonial duty in the Judiciary Act of 1789, which provided for compulsory attendance of witnesses in the federal courts.[6] MR. JUSTICE WHITE noted the importance of this essential power of government in his concurring opinion in *Murphy* v. *Waterfront Comm'n*, 378 U. S. 52, 93–94 (1964):

> "Among the necessary and most important of the powers of the States as well as the Federal Government to assure the effective functioning of government in an ordered society is the broad power to compel residents to testify in court or before grand juries or agencies. See *Blair* v. *United States,* 250 U. S. 273. Such testimony constitutes one of the Government's primary sources of information."

But the power to compel testimony is not absolute. There are a number of exemptions from the testimonial duty,[7] the most important of which is the Fifth Amendment privilege against compulsory self-incrimination. The privilege reflects a complex of our fundamental values and aspirations,[8] and marks an important advance in the development of our liberty.[9] It can be asserted in any proceeding, civil or criminal, administrative or judicial, investigatory or adjudicatory;[10] and it

---

[6] 1 Stat. 73, 88–89.

[7] See *Blair* v. *United States, supra,* at 281; 8 Wigmore, *supra,* n. 2, §§ 2192, 2197.

[8] See *Murphy* v. *Waterfront Comm'n,* 378 U. S. 52, 55 (1964).

[9] See *Ullmann* v. *United States,* 350 U. S., at 426; E. Griswold, The Fifth Amendment Today 7 (1955).

[10] *Murphy* v. *Waterfront Comm'n, supra,* at 94 (WHITE, J., concurring); *McCarthy* v. *Arndstein,* 266 U. S. 34, 40 (1924); *United States* v. *Saline Bank,* 1 Pet. 100 (1828); cf. *Gardner* v. *Broderick,* 392 U. S. 273 (1968).

protects against any disclosures that the witness reasonably believes could be used in a criminal prosecution or could lead to other evidence that might be so used.[11] This Court has been zealous to safeguard the values that underlie the privilege.[12]

Immunity statutes, which have historical roots deep in Anglo-American jurisprudence,[13] are not incompatible

---

[11] *Hoffman* v. *United States*, 341 U. S. 479, 486 (1951); *Blau* v. *United States*, 340 U. S. 159 (1950); *Mason* v. *United States*, 244 U. S. 362, 365 (1917).

[12] See, *e. g.*, *Miranda* v. *Arizona*, 384 U. S. 436, 443–444 (1966); *Boyd* v. *United States*, 116 U. S. 616, 635 (1886).

[13] Soon after the privilege against compulsory self-incrimination became firmly established in law, it was recognized that the privilege did not apply when immunity, or "indemnity," in the English usage, had been granted. See L. Levy, Origins of the Fifth Amendment 328, 495 (1968). Parliament enacted an immunity statute in 1710 directed against illegal gambling, 9 Anne, c. 14, §§ 3–4, which became the model for an identical immunity statute enacted in 1774 by the Colonial Legislature of New York. Law of Mar. 9, 1774, c. 1651, 5 Colonial Laws of New York 621, 623 (1894). These statutes provided that the loser could sue the winner, who was compelled to answer the loser's charges. After the winner responded and returned his ill-gotten gains, he was "acquitted, indemnified [immunized] and discharged from any further or other Punishment, Forfeiture or Penalty, which he . . . may have incurred by the playing for, and winning such Money . . . ." 9 Anne, c. 14, § 4 (1710); Law of Mar. 9, 1774, c. 1651, 5 Colonial Laws of New York, at 623.

Another notable instance of the early use of immunity legislation is the 1725 impeachment trial of Lord Chancellor Macclesfield. The Lord Chancellor was accused by the House of Commons of the sale of public offices and appointments. In order to compel the testimony of Masters in Chancery who had allegedly purchased their offices from the Lord Chancellor, and who could incriminate themselves by so testifying, Parliament enacted a statute granting immunity to persons then holding office as Masters in Chancery. *Lord Chancellor Macclesfield's Trial*, 16 How. St. Tr. 767, 1147 (1725). See 8 Wigmore, *supra*, n. 2, § 2281, at 492. See also *Bishop Atterbury's Trial*, 16 How. St. Tr. 323, 604–605 (1723). The legislatures

with these values. Rather, they seek a rational accommodation between the imperatives of the privilege and the legitimate demands of government to compel citizens to testify. The existence of these statutes reflects the importance of testimony, and the fact that many offenses are of such a character that the only persons capable of giving useful testimony are those implicated in the crime. Indeed, their origins were in the context of such offenses,[14]

in colonial Pennsylvania and New York enacted immunity legislation in the 18th century. See, e. g., Resolution of Jan. 6, 1758, in Votes and Proceedings of the House of Representatives of the Province of Pennsylvania (1682–1776), 6 Pennsylvania Archives (8th series) 4679 (C. Hoban ed. 1935); Law of Mar. 24, 1772, c. 1542, 5 Colonial Laws of New York 351, 353–354; Law of Mar. 9, 1774, c. 1651, id., at 621, 623; Law of Mar. 9, 1774, c. 1655, id., at 639, 641–642. See generally L. Levy, Origins of the Fifth Amendment 359, 384–385, 389, 402–403 (1968). Federal immunity statutes have existed since 1857. Act of Jan. 24, 1857, 11 Stat. 155. For a history of the various federal immunity statutes, see Comment, The Federal Witness Immunity Acts in Theory and Practice: Treading the Constitutional Tightrope, 72 Yale L. J. 1568 (1963); Wendel, Compulsory Immunity Legislation and the Fifth Amendment Privilege: New Developments and New Confusion, 10 St. Louis U. L. Rev. 327 (1966); and National Commission on Reform of Federal Criminal Laws, Working Papers, 1406–1411 (1970).

[14] See, e. g., Resolution of Jan. 6, 1758, n. 13, supra, 6 Pennsylvania Archives (8th series) 4679 (C. Hoban ed. 1935); Law of Mar. 24, 1772, c. 1542, 5 Colonial Laws of New York 351, 354; Law of Mar. 9, 1774, c. 1655, id., at 639, 642. Bishop Atterbury's Trial, supra, for which the House of Commons passed immunity legislation, was a prosecution for treasonable conspiracy. See id., at 604–605; 8 Wigmore, supra, n. 2, § 2281, at 492 n. 2. Lord Chancellor Macclesfield's Trial, supra, for which Parliament passed immunity legislation, was a prosecution for political bribery involving the sale of public offices and appointments. See id., at 1147. The first federal immunity statute was enacted to facilitate an investigation of charges of corruption and vote buying in the House of Representatives. See Comment, n. 13, supra, 72 Yale L. J., at 1571.

and their primary use has been to investigate such offenses.[15] Congress included immunity statutes in many of the regulatory measures adopted in the first half of this century.[16] Indeed, prior to the enactment of the statute under consideration in this case, there were in force over 50 federal immunity statutes.[17] In addition, every State in the Union, as well as the District of Columbia and Puerto Rico, has one or more such statutes.[18] The commentators,[19] and this Court on several occasions,[20] have characterized immunity statutes as essential to the effective enforcement of various criminal statutes. As Mr. Justice Frankfurter observed, speaking for the Court in *Ullmann* v. *United States,* 350 U. S. 422 (1956), such statutes have "become part of our constitutional fabric."[21] *Id.,* at 438.

---

[15] See 8 Wigmore, *supra,* n. 2, § 2281, at 492. MR. JUSTICE WHITE noted in his concurring opinion in *Murphy* v. *Waterfront Comm'n,* 378 U. S., at 92, that immunity statutes "have for more than a century been resorted to for the investigation of many offenses, chiefly those whose proof and punishment were otherwise impracticable, such as political bribery, extortion, gambling, consumer frauds, liquor violations, commercial larceny, and various forms of racketeering." *Id.,* at 94–95. See n. 14, *supra.*

[16] See Comment, n. 13, *supra,* 72 Yale L. J., at 1576.

[17] For a listing of these statutes, see National Commission on Reform of Federal Criminal Laws, Working Papers, 1444–1445 (1970).

[18] For a listing of these statutes, see 8 Wigmore, *supra,* n. 2, § 2281, at 495 n. 11.

[19] See, *e. g.,* 8 J. Wigmore, Evidence § 2281, at 501 (3d ed. 1940); 8 Wigmore, *supra,* n. 2, § 2281, at 496.

[20] See *Hale* v. *Henkel,* 201 U. S. 43, 70 (1906); *Brown* v. *Walker,* 161 U. S., at 610.

[21] This statement was made with specific reference to the Compulsory Testimony Act of 1893, 27 Stat. 443, the model for almost all federal immunity statutes prior to the enactment of the statute under consideration in this case. See *Murphy* v. *Waterfront Comm'n,* 378 U. S., at 95 (WHITE, J., concurring).

## II

Petitioners contend, first, that the Fifth Amendment's privilege against compulsory self-incrimination, which is that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself," deprives Congress of power to enact laws that compel self-incrimination, even if complete immunity from prosecution is granted prior to the compulsion of the incriminatory testimony. In other words, petitioners assert that no immunity statute, however drawn, can afford a lawful basis for compelling incriminatory testimony. They ask us to reconsider and overrule *Brown* v. *Walker,* 161 U. S. 591 (1896), and *Ullmann* v. *United States, supra,* decisions that uphold the constitutionality of immunity statutes.[22] We find no merit to this contention and reaffirm the decisions in *Brown* and *Ullmann.*

## III

Petitioners' second contention is that the scope of immunity provided by the federal witness immunity statute, 18 U. S. C. § 6002, is not coextensive with the scope of the Fifth Amendment privilege against compulsory self-incrimination, and therefore is not sufficient to supplant the privilege and compel testimony over a claim of the privilege. The statute provides that when a witness is compelled by district court order to testify over a claim of the privilege:

> "the witness may not refuse to comply with the order on the basis of his privilege against self-incrimination; but no testimony or other information compelled under the order (or any information

---

[22] Accord, *Gardner* v. *Broderick,* 392 U. S., at 276; *Murphy* v. *Waterfront Comm'n, supra; McCarthy* v. *Arndstein,* 266 U. S., at 42 (Brandeis, J.); *Heike* v. *United States,* 227 U. S. 131, 142 (1913) (Holmes, J.).

directly or indirectly derived from such testimony or other information) may be used against the witness in any criminal case, except a prosecution for perjury, giving a false statement, or otherwise failing to comply with the order." [23]   18 U. S. C. § 6002.

The constitutional inquiry, rooted in logic and history, as well as in the decisions of this Court, is whether the immunity granted under this statute is coextensive with the scope of the privilege.[24]   If so, petitioners' refusals to answer based on the privilege were unjustified, and the judgments of contempt were proper, for the grant of immunity has removed the dangers against which the privilege protects. *Brown* v. *Walker, supra.* If, on the other hand, the immunity granted is not as comprehensive as the protection afforded by the privilege, petitioners were justified in refusing to answer, and the judgments of contempt must be vacated. *McCarthy* v. *Arndstein,* 266 U. S. 34, 42 (1924).

Petitioners draw a distinction between statutes that provide transactional immunity and those that provide, as does the statute before us, immunity from use and derivative use.[25]   They contend that a statute must at a minimum grant full transactional immunity in order to be coextensive with the scope of the privilege. In support of this contention, they rely on *Counselman* v. *Hitchcock,* 142 U. S. 547 (1892), the first case in which this Court considered a constitutional challenge to an immunity statute. The statute, a re-enactment of the Immunity Act of 1868,[26] provided that no "evidence obtained from a party or witness by means of a judicial

---

[23] For other provisions of the 1970 Act relative to immunity of witnesses, see 18 U. S. C. §§ 6001–6005.

[24] See, *e. g., Murphy* v. *Waterfront Comm'n, supra,* at 54, 78; *Counselman* v. *Hitchcock,* 142 U. S. 547, 585 (1892).

[25] See *Piccirillo* v. *New York,* 400 U. S. 548 (1971).

[26] 15 Stat. 37.

proceeding . . . shall be given in evidence, or in any manner used against him . . . in any court of the United States . . . ." [27]  Notwithstanding a grant of immunity and order to testify under the revised 1868 Act, the witness, asserting his privilege against compulsory self-incrimination, refused to testify before a federal grand jury.  He was consequently adjudged in contempt of court.[28]  On appeal, this Court construed the statute as affording a witness protection only against the use of the specific testimony compelled from him under the grant of immunity.  This construction meant that the statute "could not, and would not, prevent the use of his testimony to search out other testimony to be used in evidence against him." [29]  Since the revised 1868 Act, as construed by the Court, would permit the use against the immunized witness of evidence derived from his compelled testimony, it did not protect the witness to the same extent that a claim of the privilege would protect him.  Accordingly, under the principle that a grant of immunity cannot supplant the privilege, and is not sufficient to compel testimony over a claim of the privilege, unless the scope of the grant of immunity is coextensive with the scope of the privilege,[30] the witness' refusal to testify was held proper.  In the course of its opinion, the Court made the following statement, on which petitioners heavily rely:

"We are clearly of opinion that no statute which leaves the party or witness subject to prosecution

---

[27] See *Counselman* v. *Hitchcock, supra,* at 560.

[28] *In re Counselman,* 44 F. 268 (CCND Ill. 1890).

[29] *Counselman* v. *Hitchcock, supra,* at 564.

[30] Precisely, the Court held "that legislation cannot abridge a constitutional privilege, and that it cannot replace or supply [*sic*] one, at least unless it is so broad as to have the same extent in scope and effect." *Id.,* at 585.  See *Murphy* v. *Waterfront Comm'n, supra,* at 54, 78.

after he answers the criminating question put to him, can have the effect of supplanting the privilege conferred by the Constitution of the United States. [The immunity statute under consideration] does not supply a complete protection from all the perils against which the constitutional prohibition was designed to guard, and is not a full substitute for that prohibition. In view of the constitutional provision, a statutory enactment, to be valid, must afford absolute immunity against future prosecution for the offence to which the question relates." 142 U. S., at 585–586.

Sixteen days after the *Counselman* decision, a new immunity bill was introduced by Senator Cullom,[31] who urged that enforcement of the Interstate Commerce Act would be impossible in the absence of an effective immunity statute.[32] The bill, which became the Compulsory Testimony Act of 1893,[33] was drafted specifically to meet the broad language in *Counselman* set forth above.[34] The new Act removed the privilege against self-incrimination in hearings before the Interstate Commerce Commission and provided that:

"no person shall be prosecuted or subjected to any penalty or forfeiture for or on account of any transaction, matter or thing, concerning which he may testify, or produce evidence, documentary or otherwise . . . ." Act of Feb. 11, 1893, 27 Stat. 444.

[31] *Counselman* was decided Jan. 11, 1892. Senator Cullom introduced the new bill on Jan. 27, 1892. 23 Cong. Rec. 573.

[32] 23 Cong. Rec. 6333.

[33] Act of Feb. 11, 1893, 27 Stat. 443, repealed by the Organized Crime Control Act of 1970, Pub. L. No. 91–452, § 245, 84 Stat. 931.

[34] See the remarks of Senator Cullom, 23 Cong. Rec. 573, 6333, and Congressman Wise, who introduced the bill in the House. 24 Cong. Rec. 503. See *Shapiro* v. *United States*, 335 U. S. 1, 28–29 and n. 36 (1948).

This transactional immunity statute became the basic form for the numerous federal immunity statutes [35] until 1970, when, after re-examining applicable constitutional principles and the adequacy of existing law, Congress enacted the statute here under consideration.[36] The new statute, which does not "afford [the] absolute immunity against future prosecution" referred to in *Counselman,* was drafted to meet what Congress judged to be the conceptual basis of *Counselman,* as elaborated in subsequent decisions of the Court, namely, that immunity from the

---

[35] *Ullmann* v. *United States,* 350 U. S., at 438; *Shapiro* v. *United States, supra,* at 6. There was one minor exception. See *Piccirillo* v. *New York,* 400 U. S., at 571 and n. 11 (BRENNAN, J., dissenting); *Arndstein* v. *McCarthy,* 254 U. S. 71, 73 (1920).

[36] The statute is a product of careful study and consideration by the National Commission on Reform of Federal Criminal Laws, as well as by Congress. The Commission recommended legislation to reform the federal immunity laws. The recommendation served as the model for this statute. In commenting on its proposal in a special report to the President, the Commission said:

"We are satisfied that our substitution of immunity from use for immunity from prosecution meets constitutional requirements for overcoming the claim of privilege. Immunity from use is the only consequence flowing from a violation of the individual's constitutional right to be protected from unreasonable searches and seizures, his constitutional right to counsel, and his constitutional right not to be coerced into confessing. The proposed immunity is thus of the same scope as that frequently, even though unintentionally, conferred as the result of constitutional violations by law enforcement officers." Second Interim Report of the National Commission on Reform of Federal Criminal Laws, Mar. 17, 1969, Working Papers of the Commission, 1446 (1970).

The Commission's recommendation was based in large part on a comprehensive study of immunity and the relevant decisions of this Court prepared for the Commission by Prof. Robert G. Dixon, Jr., of the George Washington University Law Center, and transmitted to the President with the recommendations of the Commission. See National Commission on Reform of Federal Criminal Laws, Working Papers, 1405–1444 (1970).

use of compelled testimony and evidence derived therefrom is coextensive with the scope of the privilege.[37]

The statute's explicit proscription of the use in any criminal case of "testimony or other information compelled under the order (or any information directly or indirectly derived from such testimony or other information)" is consonant with Fifth Amendment standards. We hold that such immunity from use and derivative use is coextensive with the scope of the privilege against self-incrimination, and therefore is sufficient to compel testimony over a claim of the privilege. While a grant of immunity must afford protection commensurate with that afforded by the privilege, it need not be broader. Transactional immunity, which accords full immunity from prosecution for the offense to which the compelled testimony relates, affords the witness considerably broader protection than does the Fifth Amendment privilege. The privilege has never been construed to mean that one who invokes it cannot subsequently be prosecuted. Its sole concern is to afford protection against being "forced to give testimony leading to the infliction of 'penalties affixed to . . . criminal acts.' "[38] Immunity from the use of compelled testimony, as well as evidence derived directly and indirectly therefrom, affords this protection. It prohibits the prosecutorial authorities from using the compelled testimony in *any* respect, and it therefore insures that the testimony cannot lead to the infliction of criminal penalties on the witness.

Our holding is consistent with the conceptual basis of *Counselman.* The *Counselman* statute, as construed by the Court, was plainly deficient in its 'failure to

---

[37] See S. Rep. No. 91–617, pp. 51–56, 145 (1969); H. R. Rep. No. 91–1549, p. 42 (1970).

[38] *Ullmann* v. *United States,* 350 U. S., at 438–439, quoting *Boyd* v. *United States,* 116 U. S., at 634. See *Knapp* v. *Schweitzer,* 357 U. S. 371, 380 (1958).

prohibit the use against the immunized witness of evidence derived from his compelled testimony. The Court repeatedly emphasized this deficiency, noting that the statute:

> "could not, and would not, prevent the use of his testimony to search out other testimony to be used in evidence against him or his property, in a criminal proceeding . . ." 142 U. S., at 564;

that it:

> "could not prevent the obtaining and the use of witnesses and evidence which should be attributable directly to the testimony he might give under compulsion, and on which he might be convicted, when otherwise, and if he had refused to answer, he could not possibly have been convicted," *ibid.;*

and that it:

> "affords no protection against that use of compelled testimony which consists in gaining therefrom a knowledge of the details of a crime, and of sources of information which may supply other means of convicting the witness or party." 142 U. S., at 586.

The basis of the Court's decision was recognized in *Ullmann* v. *United States,* 350 U. S. 422 (1956), in which the Court reiterated that the *Counselman* statute was insufficient:

> "because the immunity granted was incomplete, in that it merely forbade the use of the testimony given and failed to protect a witness from future prosecution *based on knowledge and sources of information obtained from the compelled testimony.*" *Id.,* at 437. (Emphasis supplied.)

See also *Arndstein* v. *McCarthy,* 254 U. S. 71, 73 (1920). The broad language in *Counselman* relied upon by peti-

tioners was unnecessary to the Court's decision, and cannot be considered binding authority.[39]

In *Murphy* v. *Waterfront Comm'n*, 378 U. S. 52 (1964), the Court carefully considered immunity from use of compelled testimony and evidence derived therefrom. The *Murphy* petitioners were subpoenaed to testify at a hearing conducted by the Waterfront Commission of New York Harbor. After refusing to answer certain questions on the ground that the answers might tend to incriminate them, petitioners were granted im-

---

[39] Cf. The Supreme Court, 1963 Term, 78 Harv. L. Rev. 179, 230 (1964). Language similar to the *Counselman* dictum can be found in *Brown* v. *Walker*, 161 U. S., at 594–595, and *Hale* v. *Henkel*, 201 U. S., at 67. *Brown* and *Hale*, however, involved statutes that were clearly sufficient to supplant the privilege against self-incrimination, as they provided full immunity from prosecution "for or on account of any transaction, matter or thing, concerning which he may testify, or produce evidence . . . ." 161 U. S., at 594; 201 U. S., at 66. The same is true of *Smith* v. *United States*, 337 U. S. 137, 141, 146 (1949), and *United States* v. *Monia*, 317 U. S. 424, 425, 428 (1943). In *Albertson* v. *Subversive Activities Control Board*, 382 U. S. 70 (1965), some of the *Counselman* language urged upon us by petitioners was again quoted. But *Albertson*, like *Counselman*, involved an immunity statute that was held insufficient for failure to prohibit the use of evidence derived from compelled admissions and the use of compelled admissions as an "investigatory lead." *Id.*, at 80.

In *Adams* v. *Maryland*, 347 U. S. 179, 182 (1954), and in *United States* v. *Murdock*, 284 U. S. 141, 149 (1931), the *Counselman* dictum was referred to as the principle of *Counselman*. The references were in the context of ancillary points not essential to the decisions of the Court. The *Adams* Court did note, however, that the Fifth Amendment privilege prohibits the "use" of compelled self-incriminatory testimony. 347 U. S., at 181. In any event, the Court in *Ullmann* v. *United States*, 350 U. S., at 436–437, recognized that the rationale of *Counselman* was that the *Counselman* statute was insufficient for failure to prohibit the use of evidence derived from compelled testimony. See also *Arndstein* v. *McCarthy*, 254 U. S., at 73.

456

munity from prosecution under the laws of New Jersey and New York.[40] They continued to refuse to testify, however, on the ground that their answers might tend to incriminate them under federal law, to which the immunity did not purport to extend. They were adjudged in civil contempt, and that judgment was affirmed by the New Jersey Supreme Court.[41]

The issue before the Court in *Murphy* was whether New Jersey and New York could compel the witnesses, whom these States had immunized from prosecution under their laws, to give testimony that might then be used to convict them of a federal crime. Since New Jersey and New York had not purported to confer immunity from federal prosecution, the Court was faced with the question what limitations the Fifth Amendment privilege imposed on the prosecutorial powers of the Federal Government, a nonimmunizing sovereign. After undertaking an examination of the policies and purposes of the privilege, the Court overturned the rule that one jurisdiction within our federal structure may compel a witness to give testimony which could be used to convict him of a crime in another jurisdiction.[42] The Court held that the privilege protects state witnesses against incrimination under federal as well as state law, and federal witnesses against incrim-

---

[40] The Waterfront Commission of New York Harbor is a bistate body established under an interstate compact approved by Congress. 67 Stat. 541.

[41] *In re Waterfront Comm'n of N. Y. Harbor*, 39 N. J. 436, 189 A. 2d 36 (1963).

[42] Reconsideration of the rule that the Fifth Amendment privilege does not protect a witness in one jurisdiction against being compelled to give testimony that could be used to convict him in another jurisdiction was made necessary by the decision in *Malloy* v. *Hogan*, 378 U. S. 1 (1964), in which the Court held the Fifth Amendment privilege applicable to the States through the Fourteenth Amendment. *Murphy* v. *Waterfront Comm'n*, 378 U. S., at 57.

ination under state as well as federal law. Applying this principle to the state immunity legislation before it, the Court held the constitutional rule to be that:

> "[A] state witness may not be compelled to give testimony which may be incriminating under federal law unless the compelled testimony and its fruits cannot be used in any manner by federal officials in connection with a criminal prosecution against him. We conclude, moreover, that in order to implement this constitutional rule and accommodate the interests of the State and Federal Governments in investigating and prosecuting crime, the Federal Government must be prohibited from making any such use of compelled testimony and its fruits." [43]  378 U. S., at 79.

The Court emphasized that this rule left the state witness and the Federal Government, against which the witness had immunity only from the *use* of the compelled testimony and evidence derived therefrom, "in substantially the same position as if the witness had claimed his privilege in the absence of a state grant of immunity." *Ibid.*

It is true that in *Murphy* the Court was not presented with the precise question presented by this case, whether a jurisdiction seeking to compel testimony may do so by granting only use and derivative-use immunity, for New Jersey and New York had granted petitioners transactional immunity. The Court heretofore has not

---

[43] At this point the Court added the following note: "Once a defendant demonstrates that he has testified, under a state grant of immunity, to matters related to the federal prosecution, the federal authorities have the burden of showing that their evidence is not tainted by establishing that they had an independent, legitimate source for the disputed evidence." *Id.*, at 79 n. 18. If transactional immunity had been deemed to be the "constitutional rule" there could be no federal prosecution.

squarely confronted this question,[44] because post-*Counselman* immunity statutes reaching the Court either have followed the pattern of the 1893 Act in providing transactional immunity,[45] or have been found deficient for failure to prohibit the use of all evidence derived from compelled testimony.[46]  But both the reasoning of the Court in *Murphy* and the result reached compel the conclusion that use and derivative-use immunity is constitutionally sufficient to compel testimony over a claim of the privilege.  Since the privilege is fully applicable and its scope is the same whether invoked in a state or in a federal jurisdiction,[47] the *Murphy* conclusion that a prohibition on use and derivative use secures a witness' Fifth Amendment privilege against infringement by the Federal Government demonstrates that immunity from use and derivative use is coextensive with the scope of the privilege.  As the *Murphy* Court noted, immunity from use and derivative use "leaves the witness and the Federal Government in substantially the same position

---

[44] See, *e. g., California* v. *Byers,* 402 U. S. 424, 442 n. 3 (1971) (Harlan, J., concurring in judgment); *United States* v. *Freed,* 401 U. S. 601, 606 n. 11 (1971); *Piccirillo* v. *New York,* 400 U. S. 548 (1971); *Stevens* v. *Marks,* 383 U. S. 234, 244–245 (1966).

[45] *E. g., Murphy* v. *Waterfront Comm'n, supra; Ullmann* v. *United States, supra; Smith* v. *United States,* 337 U. S. 137 (1949); *United States* v. *Monia,* 317 U. S. 424 (1943); *Hale* v. *Henkel,* 201 U. S. 43 (1906); *Jack* v. *Kansas,* 199 U. S. 372 (1905); *Brown* v. *Walker,* 161 U. S. 591 (1896).  See also n. 35, *supra.*

[46] *E. g., Albertson* v. *Subversive Activities Control Board,* 382 U. S., at 80; *Arndstein* v. *McCarthy,* 254 U. S., at 73.

[47] In *Malloy* v. *Hogan,* 378 U. S., at 10–11, the Court held that the same standards would determine the extent or scope of the privilege in state and in federal proceedings, because the same substantive guarantee of the Bill of Rights is involved.  The *Murphy* Court emphasized that the scope of the privilege is the same in state and in federal proceedings. *Murphy* v. *Waterfront Comm'n,* 378 U. S., at 79.

as if the witness had claimed his privilege"[48] in the absence of a grant of immunity. The *Murphy* Court was concerned solely with the danger of incrimination under federal law, and held that immunity from use and derivative use was sufficient to displace the danger. This protection coextensive with the privilege is the degree of protection that the Constitution requires, and is all that the Constitution requires even against the jurisdiction compelling testimony by granting immunity.[49]

## IV

Although an analysis of prior decisions and the purpose of the Fifth Amendment privilege indicates that use and derivative-use immunity is coextensive with the privilege, we must consider additional arguments advanced by petitioners against the sufficiency of such immunity. We start from the premise, repeatedly affirmed by this Court, that an appropriately broad immunity grant is compatible with the Constitution.

Petitioners argue that use and derivative-use immunity will not adequately protect a witness from various possible incriminating uses of the compelled testimony: for example, the prosecutor or other law enforcement officials may obtain leads, names of witnesses, or other information not otherwise available that might result in a prosecution. It will be difficult and perhaps impossible, the argument goes, to identify, by testimony or cross-examination, the subtle ways in which the compelled testimony may disadvantage a witness, especially in the jurisdiction granting the immunity.

This argument presupposes that the statute's pro-

---

[48] *Ibid.*

[49] As the Court noted in *Gardner* v. *Broderick*, 392 U. S., at 276, "[a]nswers may be compelled regardless of the privilege if there is immunity from federal and state use of the compelled testimony or its fruits in connection with a criminal prosecution against the person testifying."

hibition will prove impossible to enforce. The statute provides a sweeping proscription of any use, direct or indirect, of the compelled testimony and any information derived therefrom:

"[N]o testimony or other information compelled under the order (or any information directly or indirectly derived from such testimony or other information) may be used against the witness in any criminal case . . . ." 18 U. S. C. § 6002.

This total prohibition on use provides a comprehensive safeguard, barring the use of compelled testimony as an "investigatory lead," [50] and also barring the use of any evidence obtained by focusing investigation on a witness as a result of his compelled disclosures.

A person accorded this immunity under 18 U. S. C. § 6002, and subsequently prosecuted, is not dependent for the preservation of his rights upon the integrity and good faith of the prosecuting authorities. As stated in *Murphy*:

"Once a defendant demonstrates that he has testified, under a state grant of immunity, to matters related to the federal prosecution, the federal authorities have the burden of showing that their evidence is not tainted by establishing that they had an independent, legitimate source for the disputed evidence." 378 U. S., at 79 n. 18.

This burden of proof, which we reaffirm as appropriate, is not limited to a negation of taint; rather, it imposes on the prosecution the affirmative duty to prove that the evidence it proposes to use is derived from a legitimate source wholly independent of the compelled testimony.

---

[50] See, *e. g.*, *Albertson* v. *Subversive Activities Control Board*, 382 U. S., at 80.

This is very substantial protection,[51] commensurate with that resulting from invoking the privilege itself. The privilege assures that a citizen is not compelled to incriminate himself by his own testimony. It usually operates to allow a citizen to remain silent when asked a question requiring an incriminatory answer. This statute, which operates after a witness has given incriminatory testimony, affords the same protection by assuring that the compelled testimony can in no way lead to the infliction of criminal penalties. The statute, like the Fifth Amendment, grants neither pardon nor amnesty. Both the statute and the Fifth Amendment allow the government to prosecute using evidence from legitimate independent sources.

The statutory proscription is analogous to the Fifth Amendment requirement in cases of coerced confessions.[52] A coerced confession, as revealing of leads as testimony given in exchange for immunity,[53] is inadmissible in a criminal trial, but it does not bar prosecution.[54] Moreover, a defendant against whom incriminating evidence has been obtained through a grant of immunity may be in a stronger position at trial than a defendant who asserts a Fifth Amendment coerced-confession claim. One raising a claim under this statute need only show that he testified under a grant of immunity in order to shift to the government the heavy burden of proving that all of the evidence it proposes to use was derived from

---

[51] See *Murphy* v. *Waterfront Comm'n,* 378 U. S., at 102–104 (WHITE, J., concurring).

[52] *Adams* v. *Maryland,* 347 U. S., at 181; *Bram* v. *United States,* 168 U. S. 532, 542 (1897).

[53] As MR. JUSTICE WHITE, concurring in *Murphy,* pointed out:

"A coerced confession is as revealing of leads as testimony given in exchange for immunity and indeed is excluded in part because it is compelled incrimination in violation of the privilege. *Malloy* v. *Hogan,* [378 U. S. 1, 7–8]; *Spano* v. *New York,* 360 U. S. 315; *Bram* v. *United States,* 168 U. S. 532." 378 U. S., at 103.

[54] *Jackson* v. *Denno,* 378 U. S. 368 (1964).

462

legitimate independent sources.[55] On the other hand, a defendant raising a coerced-confession claim under the Fifth Amendment must first prevail in a voluntariness hearing before his confession and evidence derived from it become inadmissible.[56]

There can be no justification in reason or policy for holding that the Constitution requires an amnesty grant where, acting pursuant to statute and accompanying safeguards, testimony is compelled in exchange for immunity from use and derivative use when no such amnesty is required where the government, acting without colorable right, coerces a defendant into incriminating himself.

We conclude that the immunity provided by 18 U. S. C. § 6002 leaves the witness and the prosecutorial authorities in substantially the same position as if the witness had claimed the Fifth Amendment privilege. The immunity therefore is coextensive with the privilege and suffices to supplant it. The judgment of the Court of Appeals for the Ninth Circuit accordingly is

*Affirmed.*

MR. JUSTICE BRENNAN and MR. JUSTICE REHNQUIST took no part in the consideration or decision of this case.

MR. JUSTICE DOUGLAS, dissenting.

The Self-Incrimination Clause says: "No person . . . shall be compelled in any criminal case to be a witness against himself." I see no answer to the proposition that he is such a witness when only "use" immunity is granted.

My views on the question of the scope of immunity that is necessary to force a witness to give up his guar-

[55] See *supra*, at 460; Brief for the United States 37; Cf. *Chapman* v. *California*, 386 U. S. 18 (1967).

[56] *Jackson* v. *Denno, supra.*

antee against self-incrimination contained in the Fifth Amendment are so well known, see *Ullmann* v. *United States,* 350 U. S. 422, 440 (dissenting), and *Piccirillo* v. *New York,* 400 U. S. 548, 549 (dissenting), that I need not write at length.

In *Counselman* v. *Hitchcock,* 142 U. S. 547, 586, the Court adopted the transactional immunity test: "In view of the constitutional provision, a statutory enactment, to be valid, must afford absolute immunity against future prosecution for the offense to which the question relates." *Id.,* at 586. In *Brown* v. *Walker,* 161 U. S. 591, a case involving another federal prosecution, the immunity statute provided that the witness would be protected "on account of any transaction . . . concerning which he may testify." *Id.,* at 594. The Court held that the immunity offered was coterminous with the privilege and that the witness could therefore be compelled to testify, a ruling that made "transactional immunity" part of the fabric of our constitutional law. *Ullmann* v. *United States, supra,* at 438.

This Court, however, apparently believes that *Counselman* and its progeny were overruled *sub silentio* in *Murphy* v. *Waterfront Comm'n,* 378 U. S. 52. *Murphy* involved state witnesses, granted transactional immunity under state law, who refused to testify for fear of subsequent federal prosecution. We held that the testimony in question could be compelled, but that the Federal Government would be barred from using any of the testimony, or its fruits, in a subsequent federal prosecution.

*Murphy* overruled, not *Counselman,* but *Feldman* v. *United States,* 322 U. S. 487, which had held "that one jurisdiction within our federal structure may compel a witness to give testimony which could be used to convict him of a crime in another jurisdiction." *Murphy* v. *Waterfront Comm'n, supra,* at 77. But *Counselman,*

as the *Murphy* Court recognized, "said nothing about the problem of incrimination under the law of another sovereign." *Id.*, at 72. That problem is one of federalism, as to require transactional immunity between jurisdictions might

"deprive a state of the right to prosecute a violation of its criminal law on the basis of another state's grant of immunity [a result which] would be gravely in derogation of its sovereignty and obstructive of its administration of justice." *United States ex rel. Catena* v. *Elias,* 449 F. 2d 40, 44 (CA3 1971).

Moreover, as Mr. Justice Brennan has pointed out, the threat of future prosecution

"substantial when a single jurisdiction both compels incriminating testimony and brings a later prosecution, may fade when the jurisdiction bringing the prosecution differs from the jurisdiction that compelled the testimony. Concern over informal and undetected exchange of information is also correspondingly less when two different jurisdictions are involved." *Piccirillo* v. *New York,* 400 U. S., at 568 (dissenting).

None of these factors apply when the threat of prosecution is from the jurisdiction seeking to compel the testimony, which is the situation we faced in *Counselman,* and which we face today. The irrelevance of *Murphy* to such a situation was made clear in *Albertson* v. *Subversive Activities Control Board,* 382 U. S. 70, in which the Court struck down an immunity statute because it failed to measure up to the standards set forth in *Counselman.* Inasmuch as no interjurisdictional problems presented themselves, *Murphy* was not even cited. That is further proof that *Murphy* was not thought significantly to

undercut *Counselman*.[1]  See *Stevens* v. *Marks*, 383 U. S. 234, 244–245; *id.*, at 249–250 (Harlan, J., concurring and dissenting); Mansfield, The Albertson Case: Conflict Between the Privilege Against Self-Incrimination and the Government's Need for Information, 1966 Sup. Ct. Rev. 103, 164.

If, as some have thought, the Bill of Rights contained only "counsels of moderation" from which courts and legislatures could deviate according to their conscience or discretion, then today's contraction of the Self-Incrimination Clause of the Fifth Amendment would be understandable.  But that has not been true, starting with Chief Justice Marshall's opinion in *United States* v. *Burr*,

---

[1] In *Albertson* v. *Subversive Activities Control Board*, 382 U. S. 70, the Court was faced with a Fifth Amendment challenge to the Communist registration provision of the Subversive Activities Control Act of 1950, 64 Stat. 987.  We held that the provision violated the prospective registrant's privilege against self-incrimination, and that the registration provision was not saved by a so-called "immunity statute" (§ 4 (f)) which prohibited the introduction into evidence in any criminal prosecution of the fact of registration under the Act.  The Court's analysis of this immunity provision rested solely on *Counselman:*

"In *Counselman* v. *Hitchcock*, 142 U. S. 547, decided in 1892, the Court held 'that no [immunity] statute which leaves the party or witness subject to prosecution after he answers the criminating question put to him, can have the effect of supplanting the privilege . . . ,' and that such a statute is valid only if it supplies 'a complete protection from all the perils against which the constitutional prohibition was designed to guard . . .' by affording 'absolute immunity against future prosecution for the offence to which the question relates.' *Id.*, at 585–586.  *Measured by these standards*, the immunity granted by § 4 (f) is not complete." 382 U. S., at 80. (Emphasis added.)

Thus, the *Albertson* Court, which could have struck the statute by employing the test approved today, went well beyond, and measured the statute solely against the more restrictive standards of *Counselman*.

25 F. Cas. 38 (No. 14692e) (CC Va.), where he ruled that the reach of the Fifth Amendment was so broad as to make the privilege applicable when there was a mere possibility of a criminal charge being made.

The Court said in *Hale* v. *Henkel,* 201 U. S. 43, 67, that "if the criminality has already been taken away, the Amendment ceases to apply." In other words, the immunity granted is adequate if it operates as a complete pardon for the offense. *Brown* v. *Walker,* 161 U. S., at 595. That is the true measure of the Self-Incrimination Clause. As MR. JUSTICE BRENNAN has stated: "[U]se immunity literally misses half the point of the privilege, for it permits the compulsion without removing the criminality." *Piccirillo* v. *New York, supra,* at 567 (dissenting).

As MR. JUSTICE BRENNAN has also said:

> "Transactional immunity . . . provides the individual with an assurance that he is not testifying about matters for which he may later be prosecuted. No question arises of tracing the use or non-use of information gleaned from the witness' compelled testimony. The sole question presented to a court is whether the subsequent prosecution is related to the substance of the compelled testimony. Both witness and government know precisely where they stand. Respect for law is furthered when the individual knows his position and is not left suspicious that a later prosecution was actually the fruit of his compelled testimony." 400 U. S., at 568–569 (dissenting).

When we allow the prosecution to offer only "use" immunity we allow it to grant far less than it has taken away. For while the precise testimony that is compelled may not be used, leads from that testimony may

be pursued and used to convict the witness.[2] My view is that the framers put it beyond the power of Congress to *compel* anyone to confess his crimes. The Self-Incrimination Clause creates, as I have said before, "the federally protected right of silence," making it unconstitutional to use a law "to pry open one's lips and make him a witness against himself." *Ullmann* v. *United States,* 350 U. S., at 446 (dissenting). That is indeed one of the chief procedural guarantees in our accusatorial system. Government acts in an ignoble way when it stoops to the end which we authorize today.

I would adhere to *Counselman* v. *Hitchcock* and hold that this attempt to dilute the Self-Incrimination Clause is unconstitutional.

MR. JUSTICE MARSHALL, dissenting.

Today the Court holds that the United States may compel a witness to give incriminating testimony, and subsequently prosecute him for crimes to which that testimony relates. I cannot believe the Fifth Amendment permits that result. See *Piccirillo* v. *New York,* 400 U. S. 548, 552 (1971) (BRENNAN, J., dissenting from dismissal of certiorari).

The Fifth Amendment gives a witness an absolute right to resist interrogation, if the testimony sought would tend to incriminate him. A grant of immunity

---

[2] As MR. JUSTICE MARSHALL points out, *post,* at 469, it is futile to expect that a ban on use or derivative use of compelled testimony can be enforced.

It is also possible that use immunity might actually have an adverse impact on the administration of justice rather than promote law enforcement. A witness might believe, with good reason, that his "immunized" testimony will inevitably lead to a felony conviction. Under such circumstances, rather than testify and aid the investigation, the witness might decide he would be better off remaining silent even if he is jailed for contempt.

may strip the witness of the right to refuse to testify, but only if it is broad enough to eliminate all possibility that the testimony will in fact operate to incriminate him. It must put him in precisely the same position, *vis-à-vis* the government that has compelled his testimony,* as he would have been in had he remained silent in reliance on the privilege. *Ullmann* v. *United States,* 350 U. S. 422 (1956); *McCarthy* v. *Arndstein,* 266 U. S. 34 (1924); *Hale* v. *Henkel,* 201 U. S. 43 (1906); *Brown* v. *Walker,* 161 U. S. 591 (1896); *Counselman* v. *Hitchcock,* 142 U. S. 547 (1892).

The Court recognizes that an immunity statute must be tested by that standard, that the relevant inquiry is whether it "leaves the witness and the prosecutorial authorities in substantially the same position as if the witness had claimed the Fifth Amendment privilege." *Ante,* at 462. I assume, moreover, that in theory that test would be met by a complete ban on the use of the compelled testimony, including all derivative use, however remote and indirect. But I cannot agree that a ban on use will in practice be total, if it remains open for the government to convict the witness on the basis of evidence derived from a legitimate independent source. The Court asserts that the witness is adequately protected by a rule imposing on the government a heavy burden of proof if it would establish the independent character of evidence to be used against the witness. But in light of the inevitable uncertainties of the fact-finding process, see *Speiser* v. *Randall,* 357 U. S. 513, 525 (1958), a greater margin of protection is required in order to provide a reliable guarantee that the witness

---

*This case does not, of course, involve the special considerations that come into play when the prosecuting government is different from the government that has compelled the testimony. See *Murphy* v. *Waterfront Comm'n,* 378 U. S. 52 (1964).

is in exactly the same position as if he had not testified. That margin can be provided only by immunity from prosecution for the offenses to which the testimony relates, *i. e.,* transactional immunity.

I do not see how it can suffice merely to put the burden of proof on the government. First, contrary to the Court's assertion, the Court's rule does leave the witness "dependent for the preservation of his rights upon the integrity and good faith of the prosecuting authorities." *Ante,* at 460. For the information relevant to the question of taint is uniquely within the knowledge of the prosecuting authorities. They alone are in a position to trace the chains of information and investigation that lead to the evidence to be used in a criminal prosecution. A witness who suspects that his compelled testimony was used to develop a lead will be hard pressed indeed to ferret out the evidence necessary to prove it. And of course it is no answer to say he need not prove it, for though the Court puts the burden of proof on the government, the government will have no difficulty in meeting its burden by mere assertion if the witness produces no contrary evidence. The good faith of the prosecuting authorities is thus the sole safeguard of the witness' rights. Second, even their good faith is not a sufficient safeguard. For the paths of information through the investigative bureaucracy may well be long and winding, and even a prosecutor acting in the best of faith cannot be certain that somewhere in the depths of his investigative apparatus, often including hundreds of employees, there was not some prohibited use of the compelled testimony. Cf. *Giglio* v. *United States,* 405 U. S. 150 (1972); *Santobello* v. *New York,* 404 U. S. 257 (1971). The Court today sets out a loose net to trap tainted evidence and prevent its use against the witness, but it accepts an intolerably great risk that tainted evidence will in fact slip through that net.

In my view the Court turns reason on its head when it compares a statutory grant of immunity to the "immunity" that is inadvertently conferred by an unconstitutional interrogation. The exclusionary rule of evidence that applies in that situation has nothing whatever to do with this case. Evidence obtained through a coercive interrogation, like evidence obtained through an illegal search, is excluded at trial because the Constitution prohibits such methods of gathering evidence. The exclusionary rules provide a partial and inadequate remedy to some victims of illegal police conduct, and a similarly partial and inadequate deterrent to police officers. An immunity statute, on the other hand, is much more ambitious than any exclusionary rule. It does not merely attempt to provide a remedy for past police misconduct, which never should have occurred. An immunity statute operates in advance of the event, and it authorizes—even encourages—interrogation that would otherwise be prohibited by the Fifth Amendment. An immunity statute thus differs from an exclusionary rule of evidence in at least two critical respects.

First, because an immunity statute gives constitutional approval to the resulting interrogation, the government is under an obligation here to remove the danger of incrimination completely and absolutely, whereas in the case of the exclusionary rules it may be sufficient to shield the witness from the fruits of the illegal search or interrogation in a partial and reasonably adequate manner. For when illegal police conduct has occurred, the exclusion of evidence does not purport to purge the conduct of its unconstitutional character. The constitutional violation remains, and may provide the basis for other relief, such as a civil action for damages (see 42 U. S. C. § 1983 and *Bivens* v. *Six Agents,* 403 U. S. 388 (1971)), or a criminal prosecution of the responsible

officers (see 18 U. S. C. §§ 241–242). The Constitution does not authorize police officers to coerce confessions or to invade privacy without cause, so long as no use is made of the evidence they obtain. But this Court has held that the Constitution does authorize the government to compel a witness to give potentially incriminating testimony, so long as no incriminating use is made of the resulting evidence. Before the government puts its seal of approval on such an interrogation, it must provide an absolutely reliable guarantee that it will not use the testimony in any way at all in aid of prosecution of the witness. The only way to provide that guarantee is to give the witness immunity from prosecution for crimes to which his testimony relates.

Second, because an immunity statute operates in advance of the interrogation, there is room to require a broad grant of transactional immunity without imperiling large numbers of otherwise valid convictions. An exclusionary rule comes into play after the interrogation or search has occurred; and the decision to question or to search is often made in haste, under pressure, by an officer who is not a lawyer. If an unconstitutional interrogation or search were held to create transactional immunity, that might well be regarded as an excessively high price to pay for the "constable's blunder." An immunity statute, on the other hand, creates a framework in which the prosecuting attorney can make a calm and reasoned decision whether to compel testimony and suffer the resulting ban on prosecution, or to forgo the testimony.

For both these reasons it is clear to me that an immunity statute must be tested by a standard far more demanding than that appropriate for an exclusionary rule fashioned to deal with past constitutional violations. Measured by that standard, the statute approved today by the Court fails miserably. I respectfully dissent.