ERVIN, Chief Judge,
dissenting.
Kastigar v. United States, 406 U.S. 441, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972), places the burden upon the government of showing, once the defendant demonstrates he has testified under a grant of immunity, that it “ ‘had an independent, legitimate source for the disputed evidence.’ ” 406 U.S. at 460, 92 S.Ct. at. 1664, 32 L.Ed.2d at 226. The burden is a “heavy burden of proving that all of the evidence [the government] proposes to use was derived from legitimate independent sources.” 406 U.S. at 461-462, 92 S.Ct. at 1665, 32 L.Ed.2d at 227 (e.s.) In all due respect to the trial court’s findings below, and the majority’s opinion of affirmance, I cannot agree that the state has met the burden required by Kastigar.
My review of the record discloses that the offense for which appellant was convicted below arose from a transaction which occurred on May 8, 1980, when the defendant presented to the Royal Trust Bank of Jacksonville a false personal financial statement on a form furnished by the Small Business Administration (SBA), and obtained a loan for the purpose of operating a restaurant. As of that date he had already begun furnishing information to government agents in a “sting” operation directed toward uncovering bribery and corruption of SBA officials and others. On July 26, 1980, and again by letter dated August 13, 1980, the United States Government agreed that its earlier offer of immunity, made on June 20, 1980, would extend to all statements made by him concerning the Royal Trust Bank loan.[1] Pursuant to this agreement, FBI *1028 agents interviewed the defendant on July 29, August 5 and August 6, 1980, at which time he gave incriminating information relating to the details of the falsely prepared financial statement.
Based upon the information provided by the defendant to the government during these interviews, the United States attorney’s office prepared a grand jury subpoena directed to a loan officer of the Royal Trust Bank, commanding him to produce all loan documents concerning loans made to the defendant, his wife or to the restaurant. The subpoena was served on August 21, 1980. Two days before the service of the subpoena, the loan officer, one Bailey, went to the restaurant and observed furniture and equipment being loaded onto trucks and taken to another restaurant in Jacksonville. Bailey, although concerned about the removal of the equipment which was the collateral for the loans, took no action until September 5, 1980, when he went to the state attorney’s office with the subpoenaed documents in order to file a complaint for possible criminal prosecution against the defendant for defrauding the bank. Acting on the information supplied by both Bailey and the documents, the state attorney’s office that same day, September 5, 1980, was able to confirm that the defendant, contrary to his representations in the SBA financial statement, did not own a residence in Stone Mountain, Georgia, free and clear of mortgages and other encumbrances.[2]
Before the event of September 5, the state attorney had been aware since late July or early August that the defendant was an FBI informant. In fact, a meeting was held between state and federal officials in late August, and another on September 5, 1980, for the purpose of sorting out the respective cases in which the federal and state governments were interested. Present at an interview of defendant conducted in Daytona Beach on September 16 and 17, 1980, were FBI agents, as well as two assistant state attorneys and a state investigator. The defendant then openly admitted his involvement in the Royal Trust Bank loans and his dealings with one of the bank’s loan officers, who had already been interviewed by government agents.
On or about September 20,1980, assistant state attorneys drafted indictments against defendant, including the charges pertaining to the Royal Trust Bank loans, but the indictments were not filed until September 2, 1981, primarily due to the request of the United States attorney to defer any possible state prosecution of the defendant in order to facilitate his cooperation with the federal investigation. From the fall of 1980 through the spring of 1981, FBI agent Taylor was in frequent contact with the state’s lead investigator, Russell Pardee, who was instructed to stay in contact with the FBI and encouraged to exchange information with federal investigative officers. At no time was any effort made by Taylor to segregate any of the information received directly or indirectly from the defendant, which was shared with the state.
Finally, on December 10, 1980, the defendant agreed to enter a guilty plea to Count I of a federal wire fraud indictment and agreed also to testify truthfully before all federal grand juries at any trials in connection with any matters relating to the formation, operation and termination of his restaurant. The government in turn agreed that Abbott was to have transactional immunity for any federal crime committed in the middle district of Florida from October 1, 1979 through September 1, 1980, which was either then known or under investigation by the FBI.
The state attorney’s office became aware of this plea agreement early in 1981, and *1029 the appellant later testified in federal court for the government. On August 27, 1981, six days before the return of the state’s indictment against Abbott, FBI agent Taylor gave state investigator Pardee transcribed notes of interviews conducted with certain Royal Trust Bank officials under the assumption that they would not be used against appellant, but rather against bank officials.
In my judgment the evidence discloses that as early as July, 1980, the United States Government extended both transactional immunity as well as use immunity to the defendant. Although a promise of transactional immunity is not binding on the state, see United States v. Barker, 542 F.2d 479, 482-83 (8th Cir.1976), a promise of use immunity is binding. See Murphy v. Waterfront Commission of New York, 378 U.S. 52, 77-79, 84 S.Ct. 1594, 1608-09, 12 L.Ed.2d 678 (1964); Kastigar v. United States. Both the state and the federal governments are “prohibited from making any such use of compelled testimony and its fruits.” Murphy, 378 U.S. at 79, 84 S.Ct. at 1609, 12 L.Ed.2d at 695 (e.s.).
Additionally, Bailey’s delivery of the Royal Trust Loan documents under federal subpoena to the state attorney’s office cannot be considered under Kastigar evidence obtained by the state independent of the grant of immunity. The subpoena was prepared solely on the basis of Abbott’s immunized statements, wherein he admitted the misrepresentations made by him on the financial statement in support of his request for a loan from Royal Trust. The trial testimony established that Bailey’s receipt of the federal subpoena was at the very minimum a contributing factor to his decision to take the subpoenaed documents, to the state attorney’s office. The state, accordingly, has not established that Bailey was a source independent of Abbott’s immunized statements for the purpose of Count I of the indictment, alleging grand theft by means of misrepresentations in the SBA financial statement through which the Royal Trust loan was obtained.
Even assuming that Bailey can somehow be considered an independent source, this fact would not relieve the state of its obligation to prove that all of the evidence it used to obtain the indictment was untainted. The state, under Kastigar, retains the burden of establishing that none of the immunized evidence which FBI agent Taylor shared freely with state agent Pardee was used.
As the state has failed to discharge the heavy burden imposed upon it by Kastigar, I would reverse Abbott’s conviction with directions that the trial court dismiss the indictment.

. The trial court’s findings of fact in its oral order denying defendant’s motion to dismiss recite that defendant was offered no use immunity from federal authorities until the date of his plea agreement to federal charges on December 10, 1980. In my judgment this finding is unsupported by the evidence. The trial judge’s order relied almost exclusively on a memorandum written by an agent of the F.B.I., dated September 23, 1980, concerning an interview with defendant which occurred on September 13, 1980, and apparently ignored the testimony of federal agents given at the hearing on the motion to dismiss, stating generally that the information received from Abbott by federal agents during August and September, 1980, would not be provided by them to the state for its use against him. This testimony, moreover, did not contradict the information contained in the memorandum, which the court characterized as “nebulous” in regard to the discussions of immunity. Among other things, the memo refers to a request made by Abbott’s attorney asking that no F.B.I. witnesses appear in state cases against Abbott. The U.S. attorney agreed to this request. The lower court’s order also referred to an offer of immunity made by the F.B.I. in a letter to the United States attorney dated August 13, 1980, which the order again described as “nebulous.” This letter pinpoints Abbott’s cooperation with the government as beginning in April, 1980, and Abbott’s concern that he could be prosecuted “for ... fraud involving the SBA loan, .... ” The letter considers Abbott to be “a non-viable subject of prosecution because of his past extensive cooperation with the Government....” Finally, it concludes with the request “that no statement made by Abbott concerning the specific matters set forth above [among other things Abbott’s acquisition of the SBA loan and the restaurant] and within the jurisdiction of your office, ... be used against Mr. Abbott.” (e.s.)
The testimony of the officers at the hearing clarified the information contained in the memorandum and the letter, by showing that the government had extended use immunity to defendant before the September 5, 1980 incident. For example, John Steele, Assistant United States Attorney, in explaining the letter of August 13, 1980, which summarized the July 26, 1980 transaction, stated:
Essentially it’s my recollection that Mr. Abbott was told that he would not be prosecuted on the SBA matter if he provided the government with information concerning it and we would not use what he said against him.
(e.s.)
The lower court’s finding that no immunity was extended to defendant until he entered his plea in federal court becomes even more tenuous when it is considered that after the earlier agreements were reached, state investigators were present at the interview of defendant conducted by federal authorities on September 16 or 17, 1980.

. Representatives of the state attorney’s office testified at the hearing that they believed they had a prosecutable case against defendant as of September 5, 1980 as to Count I relating to the loan of May 8, 1980. This is highly questionable given the later extensive relay of information between the state attorney’s office and the FBI, as discussed supra. But even accepting this statement as correct, the information the state attorney’s office received on September 5, 1980, as observed supra, derived in part from documents under federal subpoena, and the subpoena in turn was based on information supplied solely from Abbott. The subpoena, thus, served as a lead to the state that Abbott had falsified the loan application.