# Commonwealth v. Ohle

*Richard Lewis,* for Commonwealth.
*Smith B. Gephart,* for defendant Ohle.
*Lawrence K. Feitell,* for defendant Jackson.

LIPSITT, *J.*, March 30, 1978—Two juries in Dauphin County, Pennsylvania, have rendered guilty verdicts in two different cases, finding evidence of wrong by two persons in dealings with at least two officials at a high level in State government. Presently before the court are motions for new trials and in arrest of judgments. Although the misdeeds are unmistakable, they have now been transformed to afterthoughts and attention must be directed to certain gnawing issues embraced in both actions.

In the first, defendants, Charles W. Ohle and Ronald J. Jackson, were charged with three counts of theft by failure to make required disposition of funds received. The alleged thefts dealt with premium money paid on the Commonwealth of Pennsylvania policy covering the state automobile fleet to the Reserve Insurance Company of Chicago, Illinois, through Charles W. Ohle, Inc., the broker for said policy. Charles W. Ohle and Ronald J. Jackson were the principals of Charles W. Ohle, Inc. Ohle is a resident of New York and Jackson is a resident of New Jersey. The policy period ran from July 1, 1972, to June 30, 1975. The premium involved was $1,015,000. The Commonwealth alleged and produced testimony showing that on July 25, 1974, a Commonwealth check in the amount of $500,000 payable to Market Facilities, Inc., New York (a subsidiary of Reserve Insurance) and Charles W. Ohle, Inc. was delivered to an agent of Charles W. Ohle, Inc. Further, a check dated August 5, 1974, in the amount of $300,000 payable to Market Facilities and Charles W. Ohle, Inc. was also delivered to the brokers. Again, a check dated September 26, 1974, in the amount of $215,000 payable to Market Facilities and Charles W. Ohle, Inc. was also delivered to the brokers.

Reserve Insurance Company only received one payment from Charles W. Ohle, Inc. for the policy. The other payments on the premium account were never made. The premium money still owing to Reserve Insurance Company, taking into consideration that one payment has been made and also allowing for the commission which would ordinarily have gone to the brokers, is approximately $609,000.

In the second trial, the Pennsylvania Department of Justice filed additional charges of bribery and conspiracy against Charles W. Ohle and Ronald J. Jackson. These charges alleged and the testimony produced showed that from February 1973, through September 1974, Ohle and Jackson made kickback payments totalling approximately $176,000 to Frank Hilton and Anthony Trucco. At the time, Hilton was the Secretary of Property and Supplies for the Commonwealth of Pennsylvania and Trucco was head of the insurance division within the said department. The kickbacks were made in consideration for the appointment of Charles W. Ohle, Inc. as the broker for the lucrative automobile fleet insurance policy, the same policy involved in the theft charges.

It should be noted the broker's commission for the automobile fleet policy was 20 percent of the premium. During this time, it was required by Pennsylvania law that approximately 7 percent of the premium be paid to the Secretary of Property and Supplies for the benefit of the Pennsylvania Higher Education Assistance Agency (PHEAA). This was true for every Commonwealth insurance policy. A broker would receive 13 percent commission, and the other 7 percent would be legally paid to the PHEAA through the Secretary of Property and

Supplies. In the instant case, the 7 percent was properly paid by the broker to the PHEAA but an additional sum of money (6 percent) was paid back to Trucco and Hilton as consideration for appointing Ohle, Inc. broker for the policy. Charles W. Ohle, Inc. was making 7 percent commission instead of 13 percent.

By way of further background, the testimony revealed that Trucco met with defendant, Ohle, in New York City in February of 1973, at the request of Hilton for the purpose of arranging to have Charles W. Ohle, Inc., a New York insurance firm, become the broker of record on the insurance policy. The discussion involved the quid pro quo expected and, an agreement having been reached, Charles W. Ohle, Inc. was made broker of record in April, 1973. Although the checks were co-payable as mentioned previously, defendants were authorized by the insurance company to endorse and deposit the checks into the Charles W. Ohle, Inc. bank account.

On January 16, 1975, the Reserve Insurance Company notified the Commonwealth the policy would be cancelled effective January 27, 1975, for nonpayment of premium moneys due and a suit is pending by the insurance company against the Commonwealth demanding payment of the unpaid premium.

The record in these cases also shows that on February 11, 1975, the United States District Court granted immunity to defendants in connection with their testimony in related prosecutions. The district attorney of Dauphin County was notified of this immunity and advised to seal any and all evidence in connection with the crimes of bribery and conspiracy. The district attorney filed an application to place the evidence under seal and obtained a court

order on April 1, 1975, when the criminal complaints were filed against defendants.

There were numerous pre-trial motions filed as well as various motions, including demurrers, during the course of the trials. Both defendants were found guilty of theft by failure to make required disposition of funds received in violation of section 3927 of the Crimes Code of December 6, 1972, P.L. 1482, sec. 1, 18 C.P.S.A. §3927. During the trial on the bribery and conspiracy cases, defendant, Ronald J. Jackson, became ill and a mistrial was declared on motion of Jackson. Defendant, Ohle, was found guilty by the jury of both bribery and conspiracy.

The post-trial motions in both cases were argued together before the court en banc and many of the points in dispute are intertwined. During this discussion reference will be made to the individual case where the question concerns only one case.

Defendants have advanced seven issues which are being passed upon seriatim:

(1) the jurisdiction of the Dauphin County court over the charge of theft,

(2) the effect of the endorsement of the premium checks by a subsidiary of the insurance company on the theft charge and whether this constitutes payment to the insurance company,

(3) the court's conduct as error in revealing to the news media its decision on defendants' demurrer on the question of jurisdiction during the trial on the theft charge,

(4) the court's refusal to suppress the Commonwealth's evidence on all charges because defendants gave statements and provided certain records to the district attorney and the justice department officials during negotiations on a plea bargain

which was subsequently unacceptable to the Commonwealth,

(5) the court's refusal of defendants' pre-trial application to dismiss prosecution because defendants allegedly were charged under the Crimes Code and elements of the offenses occurred prior to the enactment of the Crimes Code,

(6) the court's refusal of defendants' pre-trial application to dismiss the charge of conspiracy on grounds of merger, and

(7) the court's refusal to grant the demurrer and motion for directed verdict of acquittal on the charges of bribery and conspiracy since the witnesses produced by the Commonwealth were accomplices whose testimony required corroboration.

Perhaps the predominating issue raised by defendants is whether this court had jurisdiction to try the charge of theft by failure to make required disposition of funds received: 18 C.P.S.A. §3927. Specifically, defendants allege the crime of theft, if it occurred, was committed in New York and not in Pennsylvania.

The court agrees with defendants that the territorial applicability clause set forth in 18 C.P.S.A. §102 is applicable. The pertinent portions of the clause provide: " . . . a person may be convicted under the law of this Commonwealth of an offense committed by his own conduct or the conduct of another for which he is legally accountable if either: (1) the conduct which is an element of the offense or the result which is such an element occurs within this Commonwealth. . . . "

There are four elements to the offense of theft by failure to make required disposition of funds received: "1. The obtaining of property of another; 2. Subject to an agreement or known legal obligation

upon the recipient to make specified payments or other disposition thereof; 3. Intentional dealing with property obtained as the defendant's own; and 4. Failure of the defendant to make the required disposition of the property." Com. v. Crafton, 240 Pa. Superior Ct. 12, 16, 367 A. 2d 1092 (1976). Followed in Com. v. Bhojwani, 242 Pa. Superior Ct. 406, 411, 364 A. 2d 335 (1976).

The first element of the offense involved conduct in Dauphin County when an authorized agent for defendants picked up funds in the form of $500,000, $215,000 and $300,000 checks payable by the Commonwealth of Pennsylvania to Market Facilities of New York and Charles W. Ohle, Inc. Defendants note the word "conduct" as used in 18 C.P.S.A. §102(a)(1) is defined as "[a]n action or omission and its accompanying state of mind, or, where relevant, a series of acts and omissions." 18 C.P.S.A.§103.

To impute the agent's acts to defendants (see 18 C.P.S.A. §306), the court must decide if defendants' requisite "accompanying state of mind" was present. Unfortunately, the definition of the theft offense does not provide for the mental state required when the property is obtained (Element #1). See 18 C.P.S.A. §3927(a) and §3901. Turning to the general requirements of culpability (18 C.P.S.A. §302), with respect to each material element of an offense, the person must act "intentionally, knowingly, recklessly or negligently." The evidence at trial showed that, at the very least, the agent's obtaining of the money was known by defendants and intended by them. By itself the conduct of defendants in knowingly using an agent to obtain the property of another constituted an element of the offense sufficient to provide jurisdiction to this court under 18 C.P.S.A. §102(a)(1).

In the sole case from the courts of this Commonwealth cited by defendants, Com. v. Dissinger, 59 Pa. Superior Ct. 247, 252-255 (1915), where a party without fraud obtained promissory notes to renew other notes and the holder of the original notes refused to renew, the court held jurisdiction to be in the county where the party mailed the notes to one out of the state for a consideration as the place where the commission occurred.

The question there was venue (called jurisdiction in Dissinger) between counties over violation of Pennsylvania law, whereas, in the present case, the dispute is whether Pennsylvania has any subject matter jurisdiction. Second, in a more modern decision regarding county jurisdiction, the Superior Court in Com. v. Prep, 186 Pa. Superior Ct. 442, 448, 142 A. 2d 460 (1958), held that prosecution could be brought in Dauphin County because that is where checks were mailed by the Commonwealth. In Prep, defendant, who had a contract to supply cinders to the Department of Highways and was charged with cheating by false pretenses, received the checks in Schuylkill County. If posting in a county gives that county jurisdiction then delivery of the checks as here to defendants' agent also would be sufficient to create jurisdiction in the Commonwealth. Further, and most important, the legislature has presented specific rules for the court to apply in deciding this question of jurisdiction. Unlike in the cases above, this court is not required to look at the location where the crime was completed. Rather, it must merely find a single element was committed in the Commonwealth: 18 C.P.S.A. §102(a)(1). At defendants' request, the jury was so instructed on the law, and as shown by their returning a guilty verdict found the Commonwealth had proven an ele-

ment had been committed within the Commonwealth.

The Commonwealth points out that not only were the checks issued and delivered in Dauphin County but the legal obligation to make the payment by an appointed broker to the insurance company arose in Dauphin County and the attendant harm of depriving the State of insurance coverage occurred in Dauphin County. The Prep opinion provides an appropriate conclusion: " . . . It is a well established theory of the law that, where one puts in force an agency for the commission of crime, he, in legal contemplation, accompanies the same to the point where it becomes effectual; consequently, in many circumstances one may become liable to punishment in a particular jurisdiction while his personal presence is elsewhere, and in this way he may even commit an offense against a State or county upon whose soil he has never set his foot. . . . " Com. v. Prep, supra, at 451.

A sufficient ground for jurisdiction having been shown, this court need not delve into the alternative grounds.

Defendants' second argument concerns the question whether a New York statute authorizing brokers to receive premium payments payable to the insurer bars the jury from finding defendants guilty of failure to make the required disposition of the property (Element #4 of the offense) in connection with the theft offense.

The transfer in question involved the delivery of premium checks by the Commonwealth to defendants' brokerage firm. The checks were made payable to Charles W. Ohle, Inc. and Market Facilities. Defendants followed the common practice of depositing the premium checks in their premium trust

account to be later transferred to the insurer minus the broker's commission. This premium trust account was in New York City as were defendant brokers.

Although the premium checks were issued from Pennsylvania, the management of the premium trust account is governed by the local law of the state to which the administration of the trust is most substantially related, in this case New York: Restatement, 2d, Conflict of Law, §272; Stampolis v. Lewis, 186 Pa. Superior Ct. 285, 288-289, 142 A. 2d 348 (1958).

Defendants rely upon the New York Insurance Law, §121, titled "Broker Authorized To Receive Premium, When," and Lezak v. National Grange Mutual Insurance Co., 233 N.Y. Supp. 2d 607 (Supr. Ct. 1962). Defendants contend section 121 as interpreted by Lezak provides that payment to a broker, entrusted by the insurer with delivery of the policy to the insured, is deemed a completed payment to the insurer because the broker acts as agent for the insurer. Thus, they argue, the final element in the theft would be absent, as defendants would not have failed to make the required disposition of the property.

This theory is faulty. The brokers are merely agents authorized to receive the premium payments but with an obligation to transmit the money to the insurer, that is to make the required disposition of the property. The parties per the insurance contract expected the premiums (net the commission) to be finally received by the insurer, not the broker. Since premiums due on a policy of insurance and paid to an insurance broker for transmission to an insurance company when received by the broker become trust funds, it is the obligation of the

broker, in the faithful discharge of his duty to the insured, not to intermingle such moneys with his general funds nor to divert, but to keep the money separate and distinct from his own property and promptly transmit to the insurance company: 29 N.Y. Jur., Insurance, §463; Leterman v. Pink, 291 N.Y. Supp. 249, 254 (Sup. Ct. App. Div. 1936). There is no evidence the New York legislature intended to negate the fiduciary duty of the brokers to relay the funds due to the insurer. Rather the New York legislature has codified the fiduciary capacity of the brokers for all premiums received: New York Insurance Law, §125. See also 11 N.Y.C.R.R. 20.3.

Defendants claim since the Commonwealth avers in its answer in a civil action brought by the insurer for payment of the missing premiums that payment to the brokers, as agents of the insurer, was sufficient to bind the insurer to provide coverage, the district attorney is barred from charging in this criminal action that the brokers had a further duty to relay the money to the insurer. The Commonwealth's contentions are not inconsistent. This is a criminal case where defendants are charged with misappropriations. The position of a party asserting a defense in a civil action cannot be a ground for exculpation where a crime has been committed.

Defendants' third argument centers on a comment by the trial judge. At the conclusion of the Commonwealth's case on the theft offense, counsel argued several motions, including a demurrer on the issue of jurisdiction. The arguments were in chambers and upon leaving counsel discussed the arguments with the media. Later, upon questioning by the media, the trial judge informed the reporters that the motions, including the jurisdiction motion, were denied.

The reports that the jurisdiction motion had been denied were on radio and in the local newspaper. Upon questioning by the court, three jurors and two alternates admitted seeing or hearing the reports. Immediately, the court explained to the entire jury that the court had merely decided the questions of law raised regarding jurisdiction and that the jury's province of deciding any questions of fact regarding jurisdiction was unimpaired. The jurors were instructed not to be influenced by media reports. The jurors then indicated they understood the court's explanation. Defendants made no motions for mistrial and the trial continued. Defendants now contend the court committed prejudicial error by revealing to the jury its ruling on the legal questions surrounding jurisdiction. Further, they assert no curative instructions would have been sufficient.

As to the issue of the propriety of the remarks to the newspapers, the statements by the trial judge to the press and the reports in the media were very brief. The judge was reported to have merely said the demurrers were denied. Following a long line of cases, the Pennsylvania Supreme Court has recently repeated the applicable standard:

" 'Every unwise or irrelevant remark made in the course of a trial by a judge, a witness, or counsel does not compel the granting of a new trial. A new trial is required when the remark is prejudicial; that is, when it is of such a nature or substance or delivered in such a manner that it may reasonably be said to have deprived the defendant of a fair and impartial trial . . . ' " Com. v. Goosby, 450 Pa. 609, 611, 301 A. 2d 673 (1973).

The judge's reported statements were not prejudicial when viewed within context. The defense counsel made their demurrer on the jurisdiction

issue public through the press. Only after the media was informed by the defense of the motions did the trial judge briefly note the demurrer had been denied. The defense having voluntarily publicized the presentation of the legal issues surrounding jurisdiction, it is highly probable the motion would have been in the press even without the judge's answer.

Further, the judge fully explained to all the jurors in open court that only legal issues had been decided, while the factual issues remained in the jury's province. In the court's explanation of the demurrer, the judge instructed the jury that: ". . . the question that comes before a judge on the demurrer is merely a prima facie decision, that is, the court does not take away any authority from the jury to find a decision based upon its conception of what the facts are. . . ."

This reference to the prima facie decision was proper as ". . . it is not error for a trial judge to express his opinion as to the weight and effect of the evidence . . . provided also he does not give a binding direction or interfere with the province of the jury. . . ." Com. v. Haas, 198 Pa. Superior Ct. 227, 231, 181 A. 2d 908 (1962).

Further, the judge instructed the jury the court had no feeling one way or the other as to what the verdict should be.

Considering all the circumstances, it is clear beyond a reasonable doubt these defendants were not prejudiced by the judge's comment. Indeed, when the facts are examined in retrospect, it is doubtful if the defense should have been given the opportunity to argue the jurisdiction question to the jury for the issue may be regarded as purely legal.

Fourth, defendants claim that the court erred in refusing to grant a motion to suppress the Com-

monwealth's evidence resulting from information and statements given by defendants in reliance upon a written plea bargain. The alleged plea bargain was subsequently withdrawn by the Commonwealth.

The Commonwealth's contention that the motion to suppress was not timely made cannot be sustained as it was made prior to trial in accord with Pa.R.Crim.P. 323. (See defendants' pre-trial application to suppress evidence and transcript of proceedings before Judge Warren G. Morgan on September 30, 1976.)

Noting that neither side has presented controlling authority on the point, the court refers to Pa.R.Crim.P. 319 which states in effect that pleas are not final until accepted by the court.

The record discloses an agreement, eventually embodied in a letter, between the district attorney and defendants to allow defendants to plead guilty to lesser charges in exchange for defendants' full cooperation with the Commonwealth. Such cooperation was to include the making of statements and turning over business records to independent auditors. According to the district attorney, defendants did not fully cooperate and the plea bargain was withdrawn by the district attorney. The explanation of events was made at the pre-trial hearing during which the defense sought to suppress the evidence presented by defendants pursuant to the plea bargain. (See pre-trial hearing before Judge Warren G. Morgan, September 30, 1976.) The motion was properly denied. Although the district attorney need not present a justification to withdraw a plea agreement before court acceptance, a review of the testimony at the pre-trial hearing and the relevant pleadings reveals a justification for the

district attorney's action for even though defendants did cooperate their information was of little help. Further, defendants admit in their brief in support of motion for new trial and in arrest of judgment that the documents and statements given by defendants to the Commonwealth were not utilized in either trial although they say they were placed in a position which prevented them from testifying at trial without incriminating themselves or committing perjury.

Defendants also raise a collateral objection, alleging the use of evidence procured by the district attorney after the Federal court granted immunity to both defendants, and the district attorney had been ordered to seal its evidence. Defendants were granted immunity to compel their testimony in the Federal trial of Pennsylvania officials involved in the kickback scheme. "Use" immunity was granted, barring the use in the present State prosecution of any ". . . testimony or other information compelled under the order (or any information directly or indirectly derived from such testimony or other information) . . . against the witness. . . ." Act of October 15, 1970, 84 Stat. 927, 18 U.S.C.A. §6002. See also Kastigar v. United States, 406 U.S. 441 (1972).

The Commonwealth has the burden of showing by substantial, clear and convincing evidence that information it received in preparing its case against defendants was obtained from sources independent of testimony and information given under Federal immunity: United States v. Rice, 421 F. Supp. 871, 877 (E.D. Ill. 1976). The pre-trial hearing before Judge Warren G. Morgan on September 30, 1976, provided sufficient evidence that, in prosecuting the bribery and conspiracy offenses, the Common-

wealth not only had its evidence under seal before defendants gave their testimony in Federal court but the chief investigator for the State Department of Justice had obtained his information relative to the wrongdoing wholly independent from defendants' testimony in the Federal cases. And while the evidence obtained for the bribery and conspiracy offenses overlapped the evidence available in the theft charges, it should be observed that the grant of immunity had nothing to do with the theft of the premium moneys.

The fifth position of defendants is the court erred in refusing to dismiss the prosecution because defendants were erroneously charged under the Crimes Code. The effective date of the Crimes Code was June 6, 1973, and defendants contend elements of the offenses occurred prior to said date.

In connection with the theft, defendants assert an essential elements, i.e., the "obtaining property upon agreement or subject to a known legal obligation to make specified payments or other disposition" occurred prior to June 6, 1973. They point to the evidence showing the earlier dates of the appointment of defendants as brokers and the issuance of the insurance policy and urge that these happenings, being regarded as the "agreement" or "known legal obligation" mean there can be no prosecution under the Crimes Code for these elements of the offense occurred prior to the effective date of the act.

This reasoning must be fallacious. The theft complaints and indictments state the thefts occurred on or about July 25, August 5 and September 26, 1974. These dates are subsequent to June 6, 1973. True, testimony was introduced showing the original arrangements between the Common-

wealth and Charles W. Ohle, Inc. as taking place prior to the enactment of the Crimes Code but it wasn't until after the enactment that the offenses occurred, and the defendants actually misused Commonwealth funds. The "agreement" and "legal obligation" were continuous and did not terminate at a fixed time.

As to the bribery and conspiracy charges, defendants' argument does not have as much merit as it appears at first blush. A review of the complaints shows that in connection with the bribery, the citations are to the applicable sections under The Penal Code, 18 P.S. §4303, and the Crimes Code, 18 C.P.S.A. §4701. The defense objects because the actual indictments merely list the section number of the Crimes Code. The defense relies upon the wording of Pa.R.Crim.P. 213 which sets forth the requirements in the form of the indictment and states the essential elements of the offense as recited in the indictment must be substantially the same as or cognate to the offense alleged in the complaint. Although the narration on the face of the indictments is couched in language which conforms generally to the recitation of the Crimes Code, the words sufficiently describe the offenses of bribery and conspiracy under both applicable laws, The Penal Code and the Crimes Code. Under such circumstances, the requirements of said Rule 213 have been satisfied.

The two acts in question have differences. Bribery and conspiracy were changed from misdemeanors to felonies and the penalty for theft was increased. The available defenses may have changed, as defendants argue, and the Commonwealth may have been strengthened by utilization of the new statute. But none of these factors are of

significance in the framework of these cases. The parties were not in reality deprived of their defenses. And as a matter of simple logic, the Commonwealth cannot be thwarted in its duties as prosecutor because of an abstract supposition.

As its sixth point, the defense says the court erred in refusing the pre-trial application to dismiss the charge of conspiracy on the ground of merger. The defense argues the crime of conspiracy in this factual situation was concluded with the agreement to commit the bribery for both arose from the meeting in New York City in February of 1973 when the agreement to pay the kickback and the appointment of the broker occurred as parts of the same transaction.

The difficulty with this rationale is that the two crimes do not consist of the same essential elements. The conspiracy would be complete at the time the agreement was reached and while the bribery in the instant case was initiated at the incident of agreement, it was made complete when the moneys in question were conferred upon the Pennsylvania officials.

The final point made on behalf of defendant, Ohle, on the charges of bribery and conspiracy is that the court erred in refusing to grant the demurrer and motion for directed verdict of acquittal since the only witnesses produced by the Commonwealth were accomplices whose testimony was not corroborated.

The Crimes Code has no provision for corroboration but under The Penal Code, 18 P.S. §2, repealed effective June 6, 1973, it is provided that in a bribery case an accused shall not be convicted on the testimony of an accomplice unless the same be corroborated by other evidence or the circumstances of

the case. The defense states the same rule is applicable to testimony by accomplices on the conspiracy charge.

The Commonwealth does not dispute that the substantial testimony offered against defendant, Ohle, came from accomplices and indeed co-conspirators. However, looking at the "circumstances of the case" (see Com. v. Staudenmayer, 230 Pa. Superior Ct. 521, 326 A. 2d 421 (1974)), there was an abundance of corroboration. Defendants themselves never challenged the conduct and transactions alleged by the Commonwealth. Indeed, through the cross-examination of the several witnesses and in argument before the jury and statements during the trial, the defense acknowledged the kickbacks occurred but contended they were victims of extortion. Surely with the bribery and conspiracy so manifest, this case must be cognizable under the "circumstances of the case" interpretation of The Penal Code.

Defendants in their conclusion to their written arguments ask this court to use wisdom and render a decision which is just and fair. Their courses of reasoning were skillfully presented and require commendation. But following their admonition to be fair and just, we enter the following

ORDER

And now, March 30, 1978, the motions for new trials and in arrest of judgments filed on behalf of Charles W. Ohle and Ronald J. Jackson in connection with the charge of theft by failure to make required disposition of unds received indexed to nos. 1174 and 1179 Criminal Division 1975 and the

motions for new trial and in arrest of judgment filed on behalf of Charles W. Ohle to the bribery charge indexed to no. 1171 Criminal Division 1975 and the conspiracy charge indexed to no. 1173 Criminal Division 1975 are all denied; the district attorney is directed to call defendants for sentencing.