**UNITED STATES of America, Plaintiff,**

v.

**Richard D. SALPETER, Defendant.**

**Crim. A. No. 79–88.**

United States District Court,
D. Delaware.

Nov. 5, 1980.

James W. Garvin, Jr., U. S. Atty., William C. Carpenter, Jr., Peggy L. Ableman, Asst. U. S. Atty., Wilmington, Del., for plaintiff.

John T. Owens, Walsh, Monzack & Owens, Wilmington, Del., for defendant.

## OPINION

STAPLETON, District Judge:

### I. THE SELF–INCRIMINATION ISSUE.

The principal issue remaining in this case is whether the conviction of the defendant, Richard Salpeter, on seventeen counts of mail fraud in violation of 18 U.S.C. § 1341,[1] was obtained in violation of his Fifth Amendment right against self–incrimination. Resolution of this issue depends upon whether the government was aided in obtaining that conviction by immunized and compelled testimony previously given by Mr. Salpeter in a bankruptcy proceeding.

In 1977, banks in Florida, Pennsylvania, and Delaware suffered losses totaling more than two million dollars from a check kiting scheme conducted by Mr. Salpeter. The scheme utilized the checking accounts of numerous companies which he controlled and operated. Immediately following the discovery of the kite in late July, 1977, the Federal Bureau of Investigation ("FBI") began to investigate the defendant's alleged criminal conduct in both the Middle District of Florida and in the District of Delaware. During August and the early Fall of 1977, interviews were conducted of bank officials and employees of the defendant who had kept his accounts or managed his companies. Based on these interviews and the relevant banking records the operation of the scheme was charted by FBI agents during the Fall of 1977 for use in the anticipated prosecution.[2]

Although the United States Attorney's Office in Delaware was aware of the pending investigation and the potential charges which could result therefrom, the case was assigned initially to the United States Attorney in the Middle District of Florida for prosecution in Tampa. Specifically, the case was assigned in that office to Assistant

---

1. 18 U.S.C. § 1341 provides:

   Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, or to sell, dispose of, loan, exchange, alter, give away, distribute, supply, or furnish or procure for unlawful use any counterfeit or spurious coin, obligation, security, or other article, or anything represented to be or intimated or held out to be such counterfeit or spurious article, for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter or thing, shall be fined not more than $1,000 or imprisoned not more than five years, or both.

2. Suppression Hearings (hereinafter "Tr."), Vol. E, p. 74.

United States Attorney W. Christian Hoyer. It was not until early Fall, 1978, after the bulk of the FBI investigation had been completed, that primary responsibility for the prosecution was assumed by the Office of the United States Attorney for the District of Delaware.

Prior to the transfer of responsibility for prosecution to Delaware, those banks which had suffered losses in the course of the kite scheme initiated involuntary bankruptcy proceedings against the defendant. These proceedings were conducted before a Federal Bankruptcy Judge in the Middle District of Florida at Tampa. When called upon to testify in those proceedings Mr. Salpeter asserted his right against self–incrimination guaranteed by the Fifth Amendment. The court granted him use immunity under Section 7(a)(10) of the Bankruptcy Act and Title 18, United States Code, Sections 6001 *et seq.* and ordered him to respond to the interrogation. Mr. Salpeter thereafter testified on January 25, 1978, March 9, 1978, September 11, 1978 and November 15 and 16, 1978.

The transcripts of the bankruptcy proceedings were sealed by Order of the Bankruptcy Judge, and neither the Department of Justice, nor the Offices of the United States Attorney for the Middle District of Florida or Delaware were involved in the proceedings in any way. Furthermore, the prosecution asserts that none of its agents or attorneys attended the proceedings or read the transcripts[3] and I fully credit this testimony.

On November 6, 1979, a Federal Grand Jury in Delaware returned an indictment charging the defendant with seventeen counts of mail fraud in connection with the check kiting scheme. After the filing of the indictment, this Court conducted a pre-trial hearing to determine whether the government had made any use, direct or indirect, of the compelled testimony in its investigation and prosecution of this case. During the course of that hearing the government produced for examination every witness which it intended to call to testify during its case–in–chief. This included each witness ultimately called by the government at trial. During cross–examination of these government witnesses at the pre–trial hearing, defense counsel complained that he could not interrogate effectively without referring to the content of the immunized testimony and thereby "contaminating" the two members of the United States Attorney's Office who were then prosecuting the case against Salpeter. With the Court's acquiescence, defense counsel reserved his right to further question certain witnesses after trial and to produce additional evidence at that time in the event of a conviction. Following the pre–trial hearing, I entered an order denying defendant's motion to suppress the testimony of the witnesses called by the government, with the provision that the motion would be reconsidered "after trial on the basis of the trial testimony and any evidence tendered at the pre–trial hearing on taint from the defendant's immunized bankruptcy testimony."

At trial, the government introduced evidence tending to show that Salpeter had conceived, and had executed through his controller, Leroy Williams, and other subordinant employees, a check kite scheme to defraud the banks of money and credit.

---

**3.** There was testimony by a Mr. Friedman, an attorney for one of the banks, that Mr. Christian Hoyer, an Assistant United States Attorney for the Middle District of Florida, was present at one of the sessions of Salpeter's immunized testimony. Tr. Vol. F, pp. 40–41. Mr. Hoyer has testified that he did not attend any of the bankruptcy hearings and I credit his testimony. *See* Tr. Vol. E, p. 35.

Additionally, the defense has noted the presence at the bankruptcy hearings of a Mr. Alan Peregoy, an Internal Revenue Service agent, and Mr. Hoyer's testimony that he spoke with Peregoy in the Federal Building during the course of the bankruptcy proceedings. I am satisfied on the basis of Hoyer's testimony, however, that he had no substantive conversation with Peregoy "about the testimony of Mr. Salpeter at the bankruptcy proceedings." Tr. Vol. E, pp. 36, 56–57.

Finally, it should be noted that Peregoy played no role in the investigation that led to this prosecution and did not communicate in any way with the attorneys who prosecuted this case for the government.

The government also showed that each of the seventeen mailings of bank deposits referred to in the seventeen counts of the indictment were made in furtherance of the scheme. Williams, testifying under a grant of immunity, told the jury about the details of the origination and execution of the scheme, including Salpeter's instructions to him, how the kite grew larger and more complex, and where the proceeds of the kite went. He related that the kite had ultimately been computerized and that he had supplied the government with a computer printout laying out the entire operation of the kite. Other Salpeter employees who had participated in the kite corroborated Williams' testimony.

The defendant took the stand and acknowledged his role as the originator of the "check writing plan" described by Williams and conceded that the mailings had been a crucial part of that plan. Nor was there any dispute about his profiting from the operation of the plan. The sole issue for the jury was whether Salpeter had had an intent to defraud. He claimed he had not had such an intent because he knew that the bank officials with whom he dealt were aware of his "check writing plan" and he believed that they approved it as a means of extending credit to him. The bank officials denied that they had intended to extend credit in this manner and the government introduced other evidence tending to show that some of the banks had denied more orthodox extensions of credit to Salpeter shortly before and during the kite. The defendant was convicted on April 3, 1980 on all seventeen counts.

Shortly after the jury's verdict, a post-trial hearing was held to continue the questioning of those witnesses whose cross-examination during the pre-trial hearing had been limited. Currently before the Court is the defendant's motion to overturn his conviction on the grounds that the government has failed to establish that it did not use information disclosed in Salpeter's immunized testimony in violation of the defendant's Fifth Amendment right against self-incrimination.

In support of his motion, defendant relies primarily on the Supreme Court's decision in *Kastigar v. United States*, 406 U.S. 441, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972). In *Kastigar*, the Court faced the question whether the immunity provided by 18 U.S.C. § 6002[4] was constitutionally sufficient to compel testimony over a claim of the Fifth Amendment privilege against self-incrimination. In holding that the statutory immunity was coextensive with the protection provided by the privilege the Court noted that:

> . . . The statute provides a sweeping proscription of any use, direct or indirect, of the compelled testimony and any information derived therefrom:
>
>> "[N]o testimony or other information compelled under the order (or any information directly or indirectly derived from such testimony or other information) may be used against the witness in any criminal case. . . . 18 U.S.C. § 6002.

This total prohibition on use provides a comprehensive safeguard, barring the use of compelled testimony as an "investigatory lead," and also barring the use of any evidence obtained by focusing investigation on a witness as a result of his compelled disclosures.

406 U.S. at 460, 92 S.Ct. at 1664.

The Court also held that once it had been established that the defendant testified under this statutory immunity, the government faced the "heavy burden" of proving that all the evidence it proposes to use was derived from legitimate independent sources. 406 U.S. at 460–41, 92 S.Ct. at 1664–65. The governmental burden of establishing an independent source for all its evidence stems from the Court's recognition that only such a requirement ensures that statutory immunity will be coextensive with the privilege against self-incrimination.

In this case there is no question but that the government carried the *Kastigar* bur-

---

4. This is the same statutory immunity under which Mr. Salpeter testified.

den of showing that its evidence was derived from a "legitimate, independent source". The suppression hearing and trial evidence established beyond any doubt that each government witness to whom the jury was exposed was known to the government as a potential witness prior to the compelled testimony and testified on the basis of his or her personal knowledge of the check kiting scheme gained while it was in progress. Similarly, it has been shown that each document placed before the jury was a product of the government's investigation of the bank records and not of the compelled bankruptcy testimony. Accordingly, Salpeter does not claim that the government's evidence was tainted; rather his claim is one of "indirect", "prosecutorial" taint.

### 1. *Prosecutorial Exposure To Information From the Compelled Salpeter Testimony.*

Mr. Salpeter's first contention is that his prosecutors interviewed people who attended the compelled testimony and that the government has failed to show that they did not thereby receive information which aided them in some way in preparing and trying this case. Salpeter argues that his prosecutors' testimony that they did not knowingly seek or receive information originating from the compelled testimony does not meet this burden because they concededly did not know what information had been supplied by him in the bankruptcy proceeding and thus would not recognize tainted information when exposed to it.

The record discloses that two attorneys from the United States Attorney's Office in Delaware interviewed Mr. David McMillan, President of the Bank of Delaware, and Mr. Frank Uleau, one of Mr. Salpeter's executive employees during the period of the kite, each of whom attended portions of the compelled testimony.[5] The attorneys testified that they did not receive any information about the compelled testimony during these interviews and McMillan testified that he did not consciously relay to them anything he learned from that testimony. Uleau did not testify at the suppression hearing because of illness. The questioning by the attorneys did, however, cover subject matter also covered in the Salpeter bankruptcy testimony and special precautions were not taken, at least at the time of the Uleau interview, to focus attention on the importance of avoiding communication of information from the compelled testimony.[6] Considering the record as a whole, I think it fair to say that the prosecutors may have been exposed to information which Uleau or McMillan learned from the compelled testimony. In my view this does not end the matter, however.

I accept as true, as does Mr. Salpeter, the testimony of the attorneys that they attempted to avoid, and thought that they had succeeded in avoiding, exposure to the compelled testimony. While Mr. Salpeter is correct in saying that this does not alone meet the government's burden, it is nevertheless important. If the prosecutors in this case did have information emanating from the compelled testimony they did not realize that the defendant was its source. This case is thus far different from the prosecutorial taint cases in which the prosecutor read a transcript of the compelled testimony and had the aid that necessarily comes from the equivalent of a pre–trial deposition of the defendant. In this case, the question whether the government was aided, directly or indirectly, by the compelled testimony arises in the context of a situation where any information obtained by the prosecutors was not known by them to have originated from a statement or admission of the defendant.

Mr. Salpeter did supply information in the course of the bankruptcy proceeding which would have been helpful to the government's case. He testified, for exam-

---

**5.** Neither of these men was called as a trial witness.

**6.** Mr. McMillan was instructed not to repeat information learned at the bankruptcy testimo-

ny and made a conscious effort not to do so. He did provide information, however, the likely source of which would have been the compelled testimony.

ple, about the disposition of the funds realized from the kite and this was relevant to the issue of intent.[7] When one reviews the transcript of the bankruptcy testimony with the issues of this case in mind, however, it is apparent that there was no relevant information supplied by Salpeter during his compelled testimony which was not also known to Williams.[8] Williams had been controller of all of Mr. Salpeter's companies for years and was his confidante in business affairs. He had managed the kite on a day–to–day basis. Given the scope of Williams' knowledge regarding Salpeter's affairs, I fail to see how a prosecutor who had Williams' cooperation and who did not realize the source of any tainted information he may have possessed would have been in any better position than he would have been in if no bankruptcy had occurred.

In response to the argument that the compelled testimony was superfluous to the government's case because of Williams' knowledge and cooperation, Mr. Salpeter points out that the decision to offer Williams immunity in order to secure that knowledge and cooperation did not occur until after the compelled testimony. He suggests that this decision may have been made because the government learned of the complexity of defendant's kite scheme through the compelled testimony. I find this suggestion far fetched. The character of this case as far as complexity is concerned was apparent from the pre–bankruptcy investigation of the FBI, as was Williams' potential value as a witness. Moreover, in addition to the information obtained in that investigation from other employees about Williams' position and participation, Williams' attorney had, in the context of immunity negotiations, outlined the areas in which his client could help the government's case.[9] In sum, I am persuaded by the government that the decision

to grant immunity to Williams was not a product of information secured through the compelled testimony.

Mr. Salpeter also asserts that the government may somehow have been led to drop the Racketeer Influenced and Corrupt Organization (RICO) charges, 18 U.S.C. § 1961, *et seq.*, that were contained in its draft indictment, because he was compelled to disclose that certain of his properties were worthless and that the money from the kite had not been hidden or stashed outside the country. This contention is entirely unpersuasive.

First, Williams' cooperation was secured before the indictment was presented to the Grand Jury and, as I have already noted, Williams had a detailed knowledge of the financial condition of Salpeter's businesses as a result of the positions he held and his central role in the check kite. Thus, the government had an independent source for the information which defendant suggests may have had an influence on the charges made in the indictment.

Additionally, however, it is difficult to understand how Mr. Salpeter could have been prejudiced by the *withdrawal* of these criminal charges. He was convicted of mail fraud, the most obvious type of charge given the facts of this case. The fact that he was not prosecuted on a more serious and complex charge under RICO is simply beside the point, whatever may have been the reason for not pressing it.

2. *Prosecutorial Exposure To Documents Allegedly Produced In The Bankruptcy Proceedings.*

While much of the above analysis is equally applicable to Mr. Salpeter's argument relating to prosecutorial exposure to bankruptcy documents, the suppression hearing record is sufficiently different to warrant further comment. Mr. Salpeter

---

7. Salpeter's theory was that the bank intended him to have the money to help the cash flow of his nursing homes pending a proposed profitable sale of those homes. The compelled testimony indicated that some of the funds went to acquire improved real estate and a nursery business.

8. The broad scope and detail of Williams' knowledge is apparent from his testimony at the pre–trial taint hearings. Tr. Vol. A, pp. 108 32.

9. Tr. Vol. C, pp. 144-45, Vol. D, pp. 9-12.

refers to two sets of documents in the course of this argument: financial documents bearing bankruptcy exhibit stickers and check stubs and bank statements pertaining to a personal account maintained by Mr. Salpeter with Bank of Delaware. Each of these sets concededly wound up in the possession of the government and each is said to demonstrate that there was prosecutorial exposure to documents obtained as a result of the compelled testimony. I will examine each set in turn.

During the course of Mr. Salpeter's bankruptcy testimony on November 16, 1978, the attorney for the Exchange National Bank of Tampa showed Mr. Salpeter a series of financial statements relating to various Salpeter controlled businesses. Each covered a period of time prior to December 31, 1976 and bore a stamp indicating receipt of the document by Exchange prior to the compelled testimony. After they were marked by the reporter, Mr. Salpeter identified these documents and testified that he probably had supplied them to Exchange though he had no specific recollection of having done so. Subsequently, the Grand Jury issued subpoenas for the credit files on Mr. Salpeter from each of the banks involved in his check kite. These were examined by the prosecutors for the purpose of determining what the banks knew about Salpeter's affairs. When these credit files were thereafter produced for inspection by the defense in this case, the Exchange credit file contained the above described financial statements with the exhibit stickers in place.

While the record in this case does not explain how documents with original bankruptcy exhibit stickers affixed wound up back in the credit file of Exchange, it does establish that Salpeter was not compelled to produce these documents in the bankruptcy proceeding, and that the government would have received them pursuant to the Grand Jury subpoenas even if there had been no compelled testimony. Finally, it might be added that, even if these documents had been tainted, there has been no suggestion as to how they might have aided the government in the trial of this case.

Turning to the second set of allegedly tainted documents, it appears that Agent Graybill of the FBI's Baltimore office made an inventory of eight boxes of records in his custody in January and February of 1979. The inventory shows that all boxes except one contained checks, deposit slips, and bank statements for various Salpeter enterprises. In addition to these types of records presumably obtained by the banks, the Box 7 inventory reflects "check stubs, checks, and copies of bank statements" for a personal account which Salpeter maintained at the Bank of Delaware. Mr. Salpeter testified at the suppression hearing that, along with his bank records for a number of other personal accounts, the check stubs listed on the inventory had been produced for the inspection of the banks during his bankruptcy testimony on September 11, 1978. They remained in the banks' hands until November 16, 1978 and, according to Mr. Salpeter, this period of approximately two months was the only time these check stubs were out of his possession. He asks the Court to infer that some agent for the government made copies of the stubs during this period.

I decline to draw the suggested inference. All of the bank records of Mr. Salpeter's corporations, including those involved in the check kite scheme, were subject to being subpoenaed, and were subpoenaed, for analysis. The several personal accounts which produced the bank records presented by Salpeter for inspection by creditors on September 11, 1978 were not involved in that scheme and records for only one of those several personal accounts is reflected in the FBI inventory of records in its possession. I think it far more likely that the records of Mr. Salpeter's Bank of Delaware personal account were inadvertently produced in response to the subpoena for the business bank records than that an agent for the government made a copy of the records relating to one insignificant personal account while Mr. Salpeter's personal records were in the hands of the banks between September 11 and November 16, 1978.

Even if the inference suggested by the defense were drawn, however, the result would not be altered. As already noted, Mr. Salpeter's personal Bank of Delaware account was not involved in the check kite scheme and I can perceive no way in which access to the check stubs for that account would have been of any benefit to the government. Mr. Salpeter tacitly acknowledges this. He argues, however, that the presence of this set of documents on the FBI's inventory establishes that the government had access to documents which he was compelled to produce in the bankruptcy proceeding and, accordingly, that the government had the burden of showing that there was an independent source for all the information reflected in those documents. As previously noted, I am not persuaded that the government in fact had access to the documents produced by Salpeter during the bankruptcy testimony, but, beyond this, I believe the defense misconceives the government's burden in a case of this kind.

■ The government has established that the attorneys who tried this case had no direct access to the compelled evidence in the bankruptcy proceeding and that there was an independent source for all evidence that went before the jury. The defendant's argument is that, nevertheless, some information may have filtered through to the prosecutors which may have affected some tactical decision during pre-trial or trial. He asserts that the government must show that every piece of information comprising the compelled evidence either played no role in any of the myriad of decisions made in the course of the criminal proceeding or had an independent source. This would in most cases, be an impossible burden. It is clearly one that fairness to the defendant does not require the prosecution to shoulder. The defense in a situation of this kind is, of course, aware of the evidence which has been compelled and of the relevant trial issues. It is not unreasonable to require the defense to *identify* some part of that evidence and *articulate* some theory as to how it could conceivably have been of aid to the government before calling upon the government to *prove* that it had no access to that

compelled evidence, that the information was valueless, or that it had an independent source.

In this case, the documents produced by Mr. Salpeter in the course of his bankruptcy testimony are in his possession. Yet he did not introduce any of them or suggest any way in which they might have assisted the prosecution. The reasonable inference from the general description of those documents in the bankruptcy testimony and the character of the issues litigated in this case is that they were simply irrelevant. In these circumstances, the Fifth Amendment does not require that a conviction be overturned because information contained in some unidentified document might have played a role in some unidentified tactical decision of the prosecution.

### 3. *Conclusion.*

Reduced to its essence, Mr. Salpeter's argument is that his conviction cannot stand because *Kastigar* bars prosecution whenever it is shown that the defendant was compelled to give testimony about the subject matter of a subsequent prosecution and that the government was in some way exposed to this testimony. This interpretation, however, is inconsistent with the Court's holding that the statutory immunity at issue in *Kastigar* passed constitutional muster "by assuring that the compelled testimony can in no way lead to the infliction of criminal penalties." 406 U.S. at 461, 92 S.Ct. at 1665. The above quoted language indicates that the Court's central concern with immunized testimony is prejudice to the defendant, and not governmental exposure *per se.*

■ It is true that in most situations in which the government is exposed to compelled testimony it will not be possible to say with confidence that the prosecution received no aid. As the Eighth Circuit Court of Appeals observed in *United States v. McDaniel*, 482 F.2d 305, 311 (8th Cir. 1973), even if tainted evidence is not introduced at trial, compelled testimony may provide "assistance in focusing the investigation, deciding to initiate prosecution, re-

fusing to plea bargain, interpreting evidence, planning cross–examination and otherwise generally planning trial strategy." But these possibilities do not require the reversal of a conviction where a careful evaluation of the surrounding circumstances suggests no realistic possibility that the prosecution was aided, directly or indirectly, by the compelled testimony. *See United States v. Romano*, 583 F.2d 1 (1st Cir. 1978).

■ In this case, the nature of the crime was such that the investigation was focused on the defendant from the outset and evidence in the form of documents and employee–participants in the scheme was readily available. Virtually all of the investigation was conducted prior to the giving of the compelled testimony and one of the witnesses identified in that investigation had as much knowledge about the relevant events as did the defendant. Once the compelled testimony was given, the prosecutors made a conscious effort to avoid exposure to it and while I cannot find that they had no indirect exposure to the information supplied by Mr. Salpeter during the compelled testimony, it is clear that they did not realize the source of any information obtained through that exposure. Under these circumstances, I conclude that Mr. Salpeter's convictions are not the product of a violation of the Fifth Amendment and, accordingly, should not be overturned.

## II. POST–TRIAL MOTIONS.

In addition to its suppression motion based on allegations of Fifth Amendment "taint", the defense has filed post–trial motions for a judgment of acquittal, or alternatively, for a new trial.[10] I find, however, that I lack jurisdiction to consider these motions as they have been filed outside of the time limits imposed by Federal Rule of Criminal Procedure 33. This Rule provides that,

... A motion for a new trial based on the ground of newly discovered evidence may be made only before or within two years after final judgment, but if an appeal is pending the court may grant the motion only on remand of the case. A motion for a new trial based on any other grounds shall be made within 7 days after verdict or finding of guilty or within such further time as the court may fix during the 7–day period.

The facts relevant to this matter are as follows. Subsequent to the conclusion of trial, defense counsel filed a timely motion for an extension of time for submitting its post–trial motions. This request was granted, and the time was extended to April 25, 1980. On April 24th, counsel requested a further extension of time for the submission of these motions, and an extension was granted until June 11, 1980, the date on which the defendant's opening post–trial brief was due.[11] No additional motion or request for an extension was made, and defendant's post–trial motions and brief were not received by this Court until June 15, 1980.[12]

■ The meaning and effect of Rule 33 is plain and unambiguous. The Court of Appeals for this Circuit has held that the time limits imposed by this Rule are jurisdictional, and that any actions taken by a court outside of the authority provided are without effect. *United States v. Hamilton*, 457 F.2d 95, 99–100 (3d Cir. 1972); *United States v. Newman*, 456 F.2d 668, 670, 672 (3d Cir. 1972). Thus, it would appear that this Court was without authority to extend the time for filing post–trial motions from April 25th to June 11th, as the June 11th deadline was not fixed during the 7–day period. This issue need not be resolved, however, for the defendant's post–trial motions did not even conform to this time

---

**10.** The defendant also filed a pre–trial motion seeking dismissal on the basis of selectivity of prosecution. The record provides no support for this contention and the motion is denied.

**11.** The Order entered by this Court on April 25th reads:

The time for the defendant to file post–trial motions is deferred until the date on which his opening post–trial brief shall be due to be filed.

**12.** None of defendant's motions were based on claims of newly discovered evidence.

limit, and I am clearly without jurisdiction to act on them.

I have nevertheless considered each of the grounds urged by Mr. Salpeter in support of his application and have concluded that none warrants the relief sought. Only one calls for further comment. Defendant complains that he was not supplied with an FBI report of an interview with one government trial witness, Mr. Hoggard, until after the trial.[13] He suggests that if he had had this FBI report he would have been able to contradict the testimony of another government witness, Mr. Gray, who testified that he did not speak with defendant on the day the check kite came to light. The tardily delivered report strongly suggests, however, that Hoggard had no personal knowledge of such a telephone conversation and thus could not have testified about it. Moreover, as far as the interview report itself is concerned, an out–of–court statement of one witness that is inconsistent with the in–court testimony of a second witness, cannot be used to impeach the latter's testimony. Thus, on the current record, there is no reason to believe a new trial would produce any evidence not produced at the first trial.

---

13. The government tendered at trial the report of one interview with the witness but inadvertently did not disclose the report of a subsequent interview on October 9, 1979. The record does not disclose whether the second interview covered the same ground as the first.