# Supreme Court of the Navajo Nation

**Navajo Nation, Plaintiff,**

v.

**Peter MacDonald Jr., Defendant.**

**Decided February 13, 1992**

## OPINION

Before TSO, Chief Justice, BLUEHOUSE and AUSTIN, Associate Justices.

Steven Boos, Esq., DNA-People's Legal Services, Inc., Mexican Hat, Utah, and Lawrence Long, Esq., Window Rock, Navajo Nation (Arizona), for the Defendant; and Richard W. Hughes, Esq., Special Prosecutor for the Navajo Nation, Santa Fe, New Mexico, for the Plaintiff.

Opinion delivered by AUSTIN, Associate Justice.

This appeal is from criminal judgments entered against Peter MacDonald Jr. (MacDonald) by the Window Rock District Court on October 22, 1990. They were rendered on an October 17, 1990 jury verdict, finding MacDonald guilty of twenty-three counts of conspiracy, aiding and abetting bribery, aiding and abetting violations of the Navajo Ethics in Government Act, and other offenses. MacDonald filed a pro se appeal on November 1, 1990. On April 30, 1991, appointed appellate counsel filed a supplemental brief. The Court heard oral argument on December 9, 1991.

This appeal addresses a series of legal proceedings, beginning with the filing of the initial complaints against MacDonald on December 19, 1989, extensive pretrial motions and hearings, petitions for extraordinary relief to this Court, and a trial which lasted from September 26, 1990 through October 17, 1990. MacDonald's brief makes twenty-four assignments of error and twenty sub-claims of error. They range from the sufficiency of the criminal complaint to the legality of the sentence, and address many issues in between. They cover so many basic issues of criminal law and procedure that if we wrote a detailed analysis on every claim, the opinion would be over a hundred pages long.

This opinion follows our decision in *Navajo Nation v. MacDonald Sr.*, 6 Nav. R. 432 (1991). Where there are identical issues in that decision and this appeal, we rely upon the discussions of law in *MacDonald Sr.* We must, of necessity, briefly address many of the issues raised in this appeal.

To impose order on the process, we deal with all the assignments of error in

broad categories, and combining subcategories under them. MacDonald's assignments of error are referred to by the Roman numeral assigned in the supplemental appellate brief. The specific issues are summarized in the following general questions:

1. Whether the judge, jury and counsel in the trial of this case were competent, and did they act within their jurisdiction? (Nos. XIII, XVI, XXII, XXIV, XXIII, XVII, XI, XVIII, and XIX)
2. Whether there were errors in court rulings on pretrial matters that denied MacDonald a fair trial? (Nos. III, VI, XII, and IV)
3. Whether MacDonald should have been granted an evidentiary hearing to determine if his immunized testimony before a Senate Investigations Committee was improperly used in this case? (No. V)
4. Whether the sentence imposed violates MacDonald's right against cruel and unusual punishment? (No. XXI)

We vacate the judgments of conviction due to our ruling on assignment of error No. V, the requirement for a pretrial hearing on the use of immunized testimony. Consequently, we will not address issues of evidence and proof, pending a further hearing in the trial court. Assignments of error Nos. I, II, VII, VIII, IX, X, XX, XIV and XV are therefore reserved pending the outcome of that hearing.

# I. JUDGE, JURY AND COUNSEL

## A. JUDGE DISQUALIFICATION

MacDonald contends that the trial judge, Judge Robert Yazzie, should have recused himself because of ex parte communications and a personal animosity against Peter MacDonald Sr., a co-defendant. MacDonald contends that because his father, MacDonald Sr., once attempted to remove Judge Yazzie from office, he had reasons to exercise animosity against both defendants (XIII).

The right to an impartial judge is an essential element of due process and the basic right of a criminal defendant. *McCabe v. Walters*, 5 Nav. R. 43 (1985). The standard for the disqualification of a judge is that there must be facts which show bias and prejudice, which influences the judge so that there may not be a fair trial. *Estate of Peshlakai*, 3 Nav. R. 180 (Shiprock D. Ct. 1981); *Toledo v. Benally*, 4 Nav. R. 142 (Window Rock D. Ct. 1983). Thus, the facts brought out in the record, consisting of the motion and affidavits of disqualification and any findings by the trial court, must be reviewed to determine whether the court abused its discretion in denying the motion for disqualification.

The record reveals that, for the most part, MacDonald complains of prosecutorial errors or debatable questions of law, and not the conduct of the trial judge. Furthermore, MacDonald does not explain what the ex parte communications are and facts showing animosity are not present. The assignment is conclusive and

not supported by the record. We must not forget that the jury was the trier of fact, so the ultimate responsibility of determining guilt was not in the judge's hands. The record does not show, and MacDonald does not demonstrate, that Judge Yazzie expressed any actual animosity towards MacDonald either during the pre-trial phase of the case or during the trial itself.

MacDonald Sr. previously sought to disqualify Judge Yazzie on the ground of specific bias, and we held that he caused the circumstances which created the purported bias and could not benefit from his own conduct. *In re Certified Questions II*, 6 Nav. R. 105 (1989). That rule does not apply to this case. This is a different defendant, but there is nothing in the record to support a conclusion that Judge Yazzie acted in a biased manner towards MacDonald.

## B. JURY SELECTION, COMPOSITION AND INSTRUCTION

MacDonald joins his co-defendant in challenging the jury array as not being random or representative of the community (XVI). MacDonald argues that Austin Dawes, a court clerk, selected from voter registration lists "Anglo sound-ing names" of people living on the reservation in an attempt to "specifically select Anglos." The irony is that MacDonald challenges the process as excluding Navajos as an identifiable segment of the community. We have held that the array MacDonald complains of here was valid. *MacDonald Sr.*, 6 Nav. R. at 434.

For over a decade, the law of the Navajo Nation has been that non-Navajos will not be excluded from juries. *George v. Navajo Tribe*, 2 Nav. R. 1 (1979). In 1985, the Navajo Nation Council enacted a statute to provide that "any person" who is eligible may serve on our juries. 7 N.T.C. § 654 (1977). The trial court devised a rational method - the "Dawes Method" - to select a jury containing members who are representative of the population in the Window Rock District. This jury array was composed of both Navajos and non-Navajos. The method was not calculated to exclude any part of that community, including Navajos.

MacDonald asserts that because there was extensive pretrial publicity about this case that the trial court should have taken greater care in conducting the voir dire (examination of jurors for bias), and that it should have conducted in cam-era (i.e. closed) examinations (XXII). We first note the difference between our system and the federal system, to show that federal precedent does not necessar-ily apply. As a general matter, voir dire in federal trials is conducted by the judge, with counsel suggesting the questions to be asked. That procedure varies. The general practice in state courts and in our courts is for counsel to conduct the voir dire. The process is free and open, limited by relevance and protection against the abuse of jurors.

While the Navajo Nation argues that the federal cases cited by MacDonald, especially *Silverthorne v. United States*, 400 F.2d 627 (9th Cir. 1968), were decided using rules "arising from the supervisory authority of federal appellate courts over the [federal] district courts," and not constitutional or Indian Civil Rights Act issues, jury selection becomes a due process question if the process

did not provide the defendant a fair opportunity to examine prospective jurors for bias or undue influence. The record shows that the prosecution and the defense addressed pretrial publicity. They had the opportunity to discuss the impact of MacDonald's televised testimony and the tapes of it which were circulated throughout the Navajo Nation, as well as press accounts of the trial and the turmoil which surrounded the charges. We find nothing in the record which shows that any juror was tainted by pretrial publicity, or that any had a fixed opinion so that he or she could not impartially decide the guilt of MacDonald.

MacDonald says that Joe Figueroa, a member of the jury, purportedly made statements to a newspaper reporter (who in turn told two legal aid attorneys) that he had heard that Peter MacDonald Sr. "had mafia connections and was in the Mafia." According to MacDonald, that shows Figueroa had a preconceived bias and deceived the court when he stated in his juror questionnaire that he had no preconceived beliefs about MacDonald's guilt or innocence (XXIV).

The question is whether the trial court, abused its discretion by not probing further into the matter. The court was in a position to assess the affidavits of the legal aid attorneys, which stated what the reporter told them, and to assess whether the information revealed was sufficiently reliable to prompt a hearing. We will not disturb that discretionary decision without a greater showing that what the juror told the reporter, who told the attorneys, was reliable. Some community members enjoy gossip about public figures, and there has been much gossip about MacDonald Sr. and the Mafia. Common gossip, or the possibility a juror may have repeated it, is not a ground to reopen the voir dire process.

True, allegations of juror untruthfulness during voir dire may justify an independent evidentiary hearing. There must be a prima facie case of juror concealment of information, which if disclosed at the time would justify juror disqualification. Here, the statements simply fail to make out a prima facie case. They are too remote, unreliable, and pertain to MacDonald's co-defendant and not to MacDonald himself. The court did not abuse its discretion.

The gist of the assignment of error on jury instructions (XXIII) is that the instructions on the elements of the offenses charged should have been repeated for each count, so that the jury would be clear about their applicability to each. MacDonald also argues that the instruction on intent should have included a statement that the prosecution must prove intent beyond a reasonable doubt.

The process of instructing a jury is one of the great mysteries of the legal profession. Courts and counsel strive to translate the legalese they use into plain language so that a jury may understand the legal framework for its decision. The danger of repeating the elements of offenses is that the jurors would become confused with a lengthy reading of instructions. In this case, if the court had honored MacDonald's request on jury instructions, the elements of the various offenses would have been repeated at least sixty times. The jury would have been confused. The goal is to educate jurors, not confuse them. The trial court did not abuse its discretion by not repeating the elements for each count. The contents of

an instruction on the elements of an offense are within the sound discretion of the trial court. An instruction will be upheld unless it is clearly confusing to the lay person, or it misstates the contents of the offense statute.

The prosecution must prove each element of an offense, including intent, beyond a reasonable doubt. 17 N.T.C. § 206 (1977); *Navajo Nation v. Murphy*, 6 Nav. R. 10, 15 (1988). The record shows that this jury had a separate instruction on proof of the intent element. We conclude that the jury was properly and adequately instructed on the elements of each offense and the required burden of proof.

## C. JURISDICTION OF THE SPECIAL PROSECUTOR

MacDonald attacks the jurisdiction of the special prosecutor to prosecute him (XVII) by arguing that the Special Prosecutor Act (Act), at 2 N.T.C. § 2021(b) (1989), limits the prosecutor's jurisdiction to tribal officials. MacDonald has never been a tribal official. MacDonald also argues that because the special prosecutor lacked jurisdiction over him, the prosecutor lacked authority to sign the criminal complaint, and the charges must be dismissed. He cites *LaMone v. Navajo Nation*, 3 Nav. R. 87 (1982), in support.

We decide these issues using the reasons for passage of the Act. The Act is "an Act to Provide for the Appointment of a Special Prosecutor, and to Establish Such Counsel's Duties and Responsibilities." Navajo Nation Council Resolution No. CMA-8-89 (March 1, 1989). Whereas clause number two of the Resolution recites allegations of wrongdoing by "elected and appointed officials of the Navajo Nation." Section 2021(b) of the Act authorizes the Navajo Nation Attorney General to "conduct a preliminary investigation" to see if any official enumerated in the section had violated a federal, state, or tribal law. These officials referred to include the chairman and vice chairman of the Navajo Nation Council (now president and vice president), their executive staff members, Council standing committee chairmen, the attorney general, directors and deputy directors of agencies and entities, and employees or agents who may have acted with a conflict of interest. If the attorney general finds from the preliminary investigation that there are reasonable grounds for further investigation or prosecution, and there is a conflict of interest by the attorney general or the prosecutor's office, he or she may apply to the Special Division of the Window Rock District Court for appointment of a special prosecutor. 2 N.T.C. § 2021(e).

The special prosecutor's authority and duties are in a separate section of the Act. That person has "full power and independent authority to exercise all functions and powers of the Attorney General and the Office of the Prosecutor," and has specific authority to proceed against "any person or entity" in a civil or administrative action. 2 N.T.C. § 2023(a), (d). The special prosecutor may execute a criminal complaint, despite the provisions of 17 N.T.C. § 1801, regarding who may sign a complaint. 2 N.T.C. § 2023(e). MacDonald's argument on this issue is therefore without merit. Finally, the special prosecutor has "all necessary and proper power and authority incident to the exercise of his or her other pow-

ers and authority." 2 N.T.C. § 2023(h). The March 31, 1989 order of the Special Division of the Window Rock District Court, appointing the special prosecutor for this case, interpreted the statute to restrict the prosecutor's jurisdiction to "any current or former officials listed in the Act at 2 N.T.C. § 2021(b)." Order No. I(B) (2), *In re Appointment of Special Prosecutor of Navajo Nation*, No. WR-SD-01-89. The statute, however, is imprecise about whom the special prosecutor can charge, and the special division's order assumes that charges were limited to public officials.

The Act must be interpreted to accomplish its purpose. The tribal official limitation at Section 2021 applies to the attorney general's preliminary investigation, and not to the special prosecutor's jurisdiction. The reason for this section, and for the Act, is to avoid conflicts of interest among Navajo Nation officials. For example, the chief prosecutor may be hesitant to prosecute the president, because he is appointed by the attorney general, who is appointed by the president. An independent counsel would not have the same conflict of interest as the chief prosecutor. Thus, the purpose of the section is to avoid conflicts of interest. It is not a jurisdictional statute.

Once a special prosecutor assumes jurisdiction, the attorney general and chief prosecutor must suspend all investigations "except insofar as such special prosecutor and the Attorney General agree in writing that such investigations and proceedings may continue." 2 N.T.C. § 2021(j). That means the special prosecutor may coordinate activities with the Office of the Prosecutor and obtain its assistance for prosecutions, as was done in this case. The record shows that the Office of the Prosecutor acted as co-counsel throughout MacDonald's trial.

A central concept of the Act, which pervades Section 2021, is that the Navajo Nation needs a special prosecutor where the regular prosecutorial officials of the Navajo Nation have a "personal, financial, or political conflict of interest." Here, MacDonald is the son of a targeted public official. Conflict of interest provisions often contain prohibitions against family members' activities as part of the covered official's conduct, and the same principle applies to this criminal prosecution.

It is also within the spirit and coverage of the Act to uphold prosecutions of those who conspire with or aid and abet covered public officials. As long as rights are protected, scarce tribal financial and judicial resources are better used when all defendants who are charged with these crimes are prosecuted together. Finally, it is important to state that this ruling does not give the special prosecutor free rein to investigate and prosecute people who have absolutely no connection with the Navajo Nation Government or its officials.

### D. PROSECUTORIAL MISCONDUCT

Three assignments of error raise prosecutorial misconduct (XI, XX, XIV). We address only (XI) and reserve the other two. MacDonald claims that certain actions of the special prosecutor were so fundamentally unfair that he was denied a fair trial. That is the standard of review.

First, there are general accusations of prosecutorial misconduct. MacDonald claims that the special prosecutor deliberately deceived the court in the admission of Exhibit 324. MacDonald says that an earlier version of Exhibit 324 was in existence two weeks before its admission, yet the special prosecutor did not disclose that existence to the defense, which is in violation of the court's discovery order. The question is, what harm did that cause? Exhibit 324 was a demonstrative exhibit, consisting of a chart of contracts that the Navajo Nation had concluded with persons and entities who or which allegedly paid money or gave benefits to the MacDonalds. The exhibit was prepared by the witness used to introduce it, William Upshaw, the tribal contracting officer. This is not a matter of concealing exculpatory information. The only possible prejudice which could come from the timing of the prosecution disclosure about the exhibit would be the inability of defense counsel to check it for accuracy. That opportunity was available during a recess, if needed. MacDonald also apparently knew several months before trial that Upshaw would be testifying on these contracts. We decline to disturb the court's interpretation of its discovery order.

MacDonald also alleges misconduct based upon inflammatory remarks during the prosecution's opening statement. The offending remarks generally referred to the defendant's lifestyle, opulence and matters which were arguably not proven in evidence. We first discuss opening statements, and then the use of charged language in Navajo courts.

The function of an opening statement is to permit counsel to present their theory of the case to the jury. It is an "opening" statement, because it gives the jury an overview of the case to be presented. Both parties have an opportunity to outline the evidence they will present. The goal is to educate the jury about what it will hear, so they can understand the evidence. The statement is particularly important where the facts of the case may be complex. We reject the view that the contents of the opening statement is limited to a statement of admissible evidence. The Navajo common law principle of "talking things out" is inconsistent with such a view. It permits discussion of inferences which may arise from admissible evidence and a fair presentation of the parties' theory of the case. Here, the parties dispute whether the prosecution made representations that evidence which would be presented was not. The comments alluded to were not so misleading as to lead the jury astray.

This Court will not tolerate inflammatory language, insults, abuses of people (including judges, counsel, parties or witnesses) or any inappropriately aggressive conduct. There is already enough theatrics, hostility, sharpness, harassment and downright nastiness in non-Navajo courts. On November 1, 1991, our chief justice issued an administrative order adopting a new Code of Judicial Conduct for the Navajo judiciary. It uses Navajo legal values, including the value that trials and hearings shall be civil, and judges now have an ethical obligation to use their

power to control proceedings and prevent inappropriate conduct in the courtroom. Counsel can expect that if they are discourteous, impolite or abusive, they will be disciplined, either through a contempt citation, court disciplinary action, bar disciplinary action or counseling by the court following a trial or hearing.

The parties disagree about the effect and impact of the remarks made by the special prosecutor. MacDonald contends that they were intended to inflame the passions of the jury and invoke bias against wealth, position and power. The special prosecutor claims that the remarks were necessary to highlight its trial theory that the wealth and lifestyles of the MacDonalds were not supported by their usual income, so they had to be the product of illicit activity. Normally, counsel are permitted great leeway in presenting their arguments to the court or a jury. Here, we specifically disapprove of the comments made by the special prosecutor as shown in the transcript. We, however, cannot conclude that they swayed the jury. There was error, but it does not reach due process proportions, and it is harmless in the sense of ultimate legal harm, and not harm to the process.

## E. DEFENSE COUNSEL

MacDonald, in his brief which he attached to his notice of appeal, generally claims that he was denied effective assistance of counsel. MacDonald's appellate counsel (who were also his trial counsel) also generally make the same claim (XVIII). The grounds alleged in support are as follows: 1) Inadequate time to prepare the defense; 2) Inadequate discovery provided by the Navajo Nation; 3) One of MacDonald's attorneys (Boos) had a conflict of interest with his employer; and 4) One of MacDonald's attorneys (Boos) lacked criminal trial experience.

The parties in *MacDonald Sr.*, 6 Nav. R. 432, agreed that the rules applicable to ineffective assistance of counsel issues are found in *Strickland v. Washington*, 466 U.S. 668 (1984). The rules are these. First, "counsel is strongly presumed to have rendered adequate assistance" to the defendant. *Id.* at 690. Second, counsel's actual performance must be deficient. This determination is made after asking, "whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance." *Id.* Third, "any deficiencies in counsel's performance must be prejudicial to the defense." *Id.* at 692. Finally, "prejudice is presumed [limited] when counsel is burdened by an actual conflict of interest." *Id.*

On the claims of inadequate time to prepare and discovery, MacDonald failed to show he was prejudiced by the alleged inadequacies. The record shows that MacDonald contributed to the time constraints by delaying in applying for appointed counsel. The record does not show that performance or prejudice requirements were breached. There is also the alleged conflict of interest arising from instructions by DNA People's Legal Services to Boos that he was not to defend MacDonald. That is a separate dispute on the applicability of national Legal Services Corporation restrictions to DNA which we addressed in *Boos v. Yazzie*, 6 Nav. R. 211 (1990). Using the test that conflicts of interest are meas-

ured by actual performance, we see no actual conflict. Thus, the presumption does not arise.

Boos argues that he lacked criminal trial experience, consequently, he may have provided ineffective assistance of counsel. While he may not have had much prior criminal trial experience, he acquired it, and provided an excellent defense. The twenty-four assignments of error show that the defense was well conceived, well planned, and counsels definitely understood their defense theory. The brief on appeal was well researched, written with precision, and covers basically all objections raised at trial. Boos and his associate, Lawrence Long, did an excellent job and that conclusion is supported by the record.

We are sensitive to appellate counsels' argument on their inadequacy on appeal (XIX). They say, with reason, that they cannot argue their own inadequacy as a matter of ethics. Again, if counsels think they are "inadequate" in the handling of this appeal, the brief before us and the oral argument presented to the Court belie that modest conclusion. We do not find inadequate assistance of counsel in this record. If, however, MacDonald wishes to pursue the matter further, he may apply to the Window Rock District Court for the appointment of different counsel to relitigate the issue by means of a writ of habeas corpus.

We are aware of the hardship that court appointed pro bono publico defense causes members of our bar. Boos and Long made many sacrifices to defend this case, as did their employers, DNA People's Legal Services and the Navajo Housing Authority. The price of justice is the sacrifices lawyers make to assure it. But for the unflagging and intense commitment of counsel here, it would have been difficult to assure MacDonald a fair trial. We warn, again, that if it becomes impossible to appoint counsel for indigents, our courts will have no alternative but to begin dismissing criminal charges. Members of the Navajo Nation Bar Association give the Navajo Nation invaluable service when they accept defense appointments.

## II. PRETRIAL PROCEDURE

### A. ADEQUACY OF THE COMPLAINT

MacDonald relies on *Navajo Nation v. Lee*, 4 Nav. R. 185 (Window Rock D. Ct. 1983), to attack the sufficiency of the complaints against him (III). That decision applied the due process requirement that defendants must have sufficient information for a fair opportunity to prepare for trial and to assist with their defense. A complaint must be sufficiently specific to permit a defendant to assert the defense of double jeopardy in any subsequent prosecution. *Id.* at 186.

The adequacy of both civil and criminal pleadings have been the subject of debate since the inception of written complaints. Courts, including Navajo courts, have tended to dismiss criminal charges on technicalities, including inadequate complaints. The modern trend, which we agree with, is to relax pleading requirements because of the availability of discovery.

Discovery was available to MacDonald to find out what he must be prepared to meet at trial, so even if the complaint was inarticulately drafted, that was harmless error. We, however, find that the complaint set forth all the substantive elements of the offenses with sufficient clarity so that MacDonald was apprised of the charges he must defend against and to plead double jeopardy, if the need arises. Furthermore, on double jeopardy, this case went to trial, and there is ample documentation to show precisely what offenses MacDonald was charged with, and the facts to support them.

## B. SEVERANCE

MacDonald claims he was prejudiced by being tried with MacDonald Sr., because he gave immunized testimony which may have been used against MacDonald Sr. (VI A). We address that testimony later. MacDonald also states that because not all of the charges against both defendants arose out of the same transactions, he was prejudiced by testimony specific to MacDonald Sr. (VI B).

MacDonald was charged as an accomplice to his co-defendant, as well as a co-conspirator, in a pattern and practice of soliciting and receiving bribes. While some of the evidence went to offenses by MacDonald Sr. alone, the bulk of the case involved both defendants. Thus, we find that the charges against the defendants arose out of the same series of transactions. Furthermore, the jury, educated by the arguments of counsel and the instructions of the court, was sufficiently able to separate the charges against the defendants as they pertained to each alone.

## C. PRETRIAL DISCOVERY

MacDonald makes broad and conclusive statements about inadequate pretrial discovery, including assertions that the special prosecutor "did nothing" to aid discovery, and there was inadequate time to prepare for trial (XII). The time problem was cured by intensive defense preparation and MacDonald has not shown prejudice. The record also does not show any limitation on MacDonald's ability to do pretrial discovery.

MacDonald specifically claims that the special prosecutor failed to disclose immunity agreements between the federal government and Terry Hamilton of Thriftway, and if disclosed he could have used them to cross-examine Linda Bateman. MacDonald also says that the failure to disclose is concealment of exculpatory evidence (XI g). The argument on the immunity agreements is that had they been disclosed, the defense could have attacked the hearsay declarations of the immunized declarant as not being against penal interest. We have held that they were also declarations against pecuniary interest and separately admissible on that ground. *MacDonald Sr.*, 6 Nav. R. at 441-442.

The Arizona federal district court stated that "[w]hether the failure to disclose the fact of Hamilton's use immunity would have created a reasonable doubt of MacDonald's guilt on any count of which he was convicted is a matter for the

tribal court to decide." *In re Grand Jury Investigation of MacDonald*, No. G.J. 89-2, at 4 (D. Ariz. December 3, 1990). The discovery information complained of is not a fact which is relevant to MacDonald's innocence on a given count. It is an evidentiary point only, where the information would have been used to attack testimony which was admissible on another ground. Where a trial court's ruling is sustainable on another, independent ground, there is no prejudice.

There are also related due process and equal protection claims. They are that while the Navajo Nation had two years to prepare its case, MacDonald had only forty days; that he had to wait for appointed counsel for five months, and counsel was appointed only forty days before trial. MacDonald contributed to delay by refusing for five months to follow the court's instruction to apply for appointed counsel and to show he was indigent. When that information was provided, counsel was appointed immediately. Even if there was some fault in not appointing counsel, the time period of appointment before trial is comparable to appointments in the federal and state systems.

## D. SPEEDY TRIAL

MacDonald claims that he was denied his right to a speedy trial, as guaranteed by the Indian Civil Rights Act, 25 U.S.C. § 1302(6), and the Navajo Nation Bill of Rights, 1 N.T.C. § 7 (IV). The complaint was filed on December 19, 1989, and MacDonald was arraigned on March 12, 1990. Nine months passed between arraignment and trial, and trial commenced on September 26, 1990; six and one-half months after arraignment. The parties rely upon *Navajo Nation v. Bedonie*, 2 Nav. R. 131 (1979).

*Bedonie* adopted a four-factor test to determine whether an individual's right to a speedy trial had been denied. They are (1) the length of delay; (2) the reason for delay; (3) the defendant's assertion of his right; and (4) prejudice to the defendant. We amplify that test by adopting the rule that "the right of a speedy trial is necessarily relative. It is consistent with delays and depends upon circumstances. It secures rights to a defendant. It does not preclude the rights of public justice." *United States v. Ewell*, 383 U.S. 116, 120 (1966).

The delay was not excessive considering the circumstances of this case. This case was a massive undertaking, hampered along the way by motions and appeals. MacDonald Sr.'s retained counsel attempted to withdraw, appointed counsel attempted to withdraw in this case, witnesses litigated the validity of witness process for the trial all around the United States, and there was a civil action associated with the criminal action against MacDonald Sr. The trial court attempted to balance the needs of the prosecution and the defense with the need for swift justice. As a matter of law, the six and one-half months from arraignment to trial in this case does not rise to a presumption of prejudice.

Much of the delay was attributable to the prosecution's needs and those of the co-defendant. However, we include delay which is attributable to MacDonald. He was arraigned on March 12, 1990, and it was not until August 3, 1990 that he

applied for appointed counsel. The trial court was concerned about MacDonald's right to counsel, even though he was a law school graduate. That concern is reflected in several portions of the record.

One of the inherent powers of a court is the power to control proceedings. Navajo courts are sensitive to the speedy trial right of defendants, and they balance it against the right for a sufficient time to prepare the defense. While it is true that most criminal trials in Navajo courts are completed in far less time, some cases are so aggressively defended that pretrial proceedings necessarily delay trials. This is one of them. The trial court did not abuse its inherent power.

MacDonald was not prejudiced by any delay caused by the prosecution of his co-defendant. There is no indication that evidence was lost, memories were dimmed, defense witnesses disappeared or the defense was impaired. MacDonald was not confined pending trial, and while anxiety and concern are valid components of prejudice, they must be balanced with the right of the parties, the court and the public to an orderly trial. Order comes from adequate and proper preparation for the event, so we find no denial of the right to a speedy trial.

## III. IMMUNIZED TESTIMONY

We sustain the assignment of error (V) regarding the trial court's failure to hold a hearing on the possible use of MacDonald's immunized testimony against him, directly or indirectly. Our reasons are grounded in the facts of the case.

In October 1987, the *Arizona Republic* published a series of articles about the state of American Indian Affairs policy, including corruption by both Indians and non-Indians. In February 1988, the United States Senate established the Special Committee on Investigations to investigate the federal government's relationship to Indians. Special Committee on Investigations, *Final Report and Legislative Recommendations* No. 101-216 at 225 (101st Congress, 1st Session, November 20, 1989).

There was an extensive staff investigation, and several witnesses invoked their right against self-incrimination during depositions. They received limited use immunity for the testimony they gave. *Id.* at 230-231. The committee report notes that "[a]lthough it does not bar criminal prosecution of the compelled witness, use immunity imposes on the prosecutor the burden of demonstrating that the government's evidence is not based on or derived from information obtained during the immunized testimony." *Id.* at 231.

During the oversight hearing phase, the committee heard live testimony. The testimony about the Navajo Nation is summarized in the report as follows:

> With an introduction from private contractors, the hearings on corruption among elected officials of tribal governments commenced in full on February 6, [1989], including as witnesses the son of the Chairman of the Navajo Nation, Peter MacDonald, Jr. The principal witness the next day, Bud Brown, told the Committee of his business dealings with Chairman MacDonald and the development of the perjurious cover-story fabricated by the Chairman.

> Excerpts of surreptitious tapes were played and blow-ups of profit agreements and checks, as well as other documents, were used to substantiate the testimony. To close the day, the Committee heard from Dr. Annie Wauneka, a respected leader of the Navajo Nation.

*Id.* at 232.

The report also states as follows: "The hearings received daily coverage in the news media, including regular reports by *The Washington Post, The New York Times, The Arizona Republic* and Associated Press, as well as extensive gavel-to-gavel coverage by the Congressional Satellite Public Affairs Network (C-SPAN)." *Id.*

People within the Navajo Nation learned of MacDonald's revelations through area newspapers and videotapes which were shown in the Navajo Nation. The details of the "corruption among tribal governmental offacials," and particularly Navajo Nation officials, are found in seventeen pages of the committee's report. *Id.* at 181-198. Copies of the report were widely circulated among tribal leaders and interested people in Indian Country. MacDonald also spoke in interviews with the committee staff, the Federal Bureau of Investigation and the United States Attorney for Arizona.

This is the background which frames the issue. Not only did MacDonald give immunized testimony, but it was on television, and in newspapers and magazines around the world. Even the senate committee recognized that any prosecution would require a demonstration "that the government's evidence is not based on or derived from information obtained during the immunized testimony."

The due process clause of the Navajo Nation Bill of Rights, 1 N.T.C. § 3, required the special prosecutor to prove to the trial court, in an adversary hearing, that the evidence it used in preparing its case and the evidence offered at trial were not based on or derived from the information MacDonald gave to any official under either a formal or informal grant of immunity. The basis for this holding is simple. The right against self-incrimination is fundamental. An individual must not give information to be used for his or her own punishment unless there is a knowing and voluntary decision to do so. An individual cannot be compelled to give that information unless there are safeguards and assurances that it will not be used to develop a criminal case or be used in some way to prove that case. The safeguards are provided in *Kastigar v. United States,* 406 U.S. 441 (1972).

This is also a Navajo principle. Navajo common law rejects coercion, including coercing people to talk. Others may "talk" about a Navajo, but that does not mean coercion can be used to make that person admit guilt or the facts leading to a conclusion of guilt. Navajos often admit guilt, because honesty is another high value, but even after admitting guilt, defendants in Navajo courts are reluctant to speak.

We will not outline the hearing procedure in detail, because the judgments against MacDonald will be vacated and the case will be remanded to the trial court for the required hearing. However, when a defendant shows that he has testified under immunity, and that testimony is related to a criminal prosecution

against him, the prosecution has a burden to show that its evidence is not based on, or derived from, immunized testimony. *Id.* at 460. The prohibition extends to direct and indirect use, including leads derived from the testimony. *Id.* The prosecutor's burden of proof is a heavy one, which "is not limited to negation of taint." *Id.* "[I]t imposes on the prosecution the affirmative duty to prove that the evidence is derived from a legitimate source wholly independent of the compelled testimony." *Id.* The goal of the process is to ensure that a witness who is compelled to give imminized testimony will not suffer, and that the defendant is in the same position as if he or she had remained silent. *Id.* at 461. *Kastigar* will be used to guide the hearing procedure.

Everyone in the Navajo Nation was bombarded with the news of MacDonald's testimony before the Special Investigations Committee. The special prosecutor worked closely with the Federal Bureau of Investigation and the United States Attorney to coordinate investigation and prosecution. Even if there was the "Chinese Wall" the special prosecutor insists was there to prevent any seepage of incriminating information, the trial court should have held a hearing to ensure that the wall had no cracks in it.

The Senate Special Investigations Committee sought evidence of corruption among tribal leaders and challenged the Navajo Nation to take care of its problems. The financial, personal, emotional and public cost of that challenge has been great, but the rights of this defendant are paramount. There is a lot of discussion of the Oliver North case and his eventual freedom from criminal liability, due to his testimony during the Iran-Contra hearings. Not only are the principles of his or other cases relevant to what we decide today, but they are principles which we accept, in the interests of justice.

## IV. CRUEL AND UNUSUAL PUNISHMENT

MacDonald admits that "the stacking of six month sentences by a court may not, by itself, constitute cruel and unusual punishment." Even without that admission, we have held that the consecutive sentences, which are permitted by Navajo statute, are not cruel and unusual, because they are within the limitations fixed by the Navajo Nation Council. *MacDonald Sr.,* 6 Nav. R. at 447.

As it was with our ruling in *MacDonald Sr.,* we will not decide whether extensive confinement in the Window Rock jail is cruel and unusual punishment. The facts which show the conditions in that facility are not before us, and we do not know if that will be MacDonald's ultimate place of confinement. We also note that our ruling on the review of immunized testimony may effect whether or not MacDonald is ever confined.

## V. CONCLUSION

The judgments entered by the Window Rock District Court on October 22, 1990 are VACATED, and the case is remanded to that court for the required hearing consistent with this opinion.